In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-2753 & 10-3887

MAGNUS NORINDER,

*Petitioner-Appellee*,

*v.*

SHARON FUENTES,

*Respondent-Appellant.*

Appeals from the United States District Court
for the Southern District of Illinois.
No. 10-CV-391-WDS—**William D. Stiehl**, *Judge.*

ARGUED JUNE 9, 2011—DECIDED SEPTEMBER 6, 2011

Before MANION, WOOD, and HAMILTON, *Circuit Judges.*

WOOD, *Circuit Judge.* Although the federal courts
normally have nothing to do with child custody issues,
there is an exception for cases that arise under the Inter-
national Child Abduction Remedies Act (the Act), 42
U.S.C. §§ 11601 *et seq.*, which implements the Hague
Convention on the Civil Aspects of International Child
Abduction (the Convention), T.I.A.S. No. 11,670, 1343
U.N.T.S. 89 (Oct. 25, 1980). This is one of those cases.

Petitioner, Magnus Norinder, filed this suit against his wife, Sharon Fuentes, seeking the return of their son, JRN, to Sweden. Norinder is from Sweden and Fuentes is from the United States; both countries are parties to the Convention. The Act entitles a person whose child has wrongfully been removed to the United States in violation of the Convention to petition for return of the child to the child's country of "habitual residence," unless certain exceptions apply. See generally *Abbott v. Abbott*, 130 S. Ct. 1983 (2010); *Altamiranda Vale v. Avila*, 538 F.3d 581, 583-84 (7th Cir. 2008).

The battle here is over which country—Sweden or the United States—is JRN's habitual residence. Norinder asserts that Sweden is, and that Fuentes abducted JRN to the United States in violation of the Convention. The district court agreed and ordered JRN returned to Sweden, where Norinder is living and where Fuentes and JRN lived until recently. In this appeal, Fuentes challenges the district court's conclusion and asserts that the court should have chosen the United States instead. Both for that reason, and because she charges that there is a grave risk that JRN's return to Sweden will expose him to physical or psychological harm (a defense under the Convention that the abducter may invoke to block return of a child), she argues that the district court's order should be reversed. Finally, Fuentes asserts that the district court unfairly limited discovery before resolving the case and ordered her to pay too much in fees and costs to Norinder. We conclude that the district court's decisions are sound in all respects, and we therefore affirm.

**I**

Norinder and Fuentes, who are both physicians, met on the Internet in 2006. Norinder, a citizen of Sweden, lived in Borås, Sweden at the time; and Fuentes, who is a citizen of the United States, lived in Texas. The relationship progressed quickly: in February 2007, Fuentes visited Sweden and the couple got engaged; in April, she returned and they conceived a child; in August they were married in Sweden. After the wedding, Fuentes returned to Houston, Texas, to complete a fellowship in pathology. Norinder was chief physician of a hospital in Borås at the time. He took paternity leave in January 2008 to join Fuentes in Houston. JRN was born there the next month. In July, the whole family moved to Sweden.

It was not long before the relationship became rocky. Fuentes and Norinder had many fights, some of which escalated into physical confrontations. There are charges that JRN was harmed in the midst of these fights. On a number of occasions, Fuentes moved out of the family's house in Sweden—once to an apartment she apparently had rented in secret. Professional difficulties compounded the personal strife. Fuentes did not keep the job that Norinder secured for her at his hospital in Borås, and Norinder was suspended from work while the hospital investigated charges instigated by Fuentes that Norinder had substance abuse problems. Fuentes accused Norinder of drinking too much and abusing prescription drugs, and there is some evidence that he has had difficulty with drugs and alcohol in the past. While the two were in Sweden, divorce proceedings were initi-

ated and then abandoned on a number of occasions. None of this, however, is directly relevant to the resolution of this case. Our authority over Norinder's petition extends only to the question whether JRN was abducted and should be returned to Sweden; we do not sit to resolve a messy domestic conflict. See 42 U.S.C. § 11601(b)(4); Hague Convention art. 19; *Shalit v. Coppe*, 182 F.3d 1124, 1128 (9th Cir. 1999); *Friedrich v. Friedrich*, 78 F.3d 1060, 1063-64 (6th Cir. 1996).

The event that gave rise to this proceeding occurred after two years of the unhappiness we have just recounted. On March 17, 2010, under the guise of a two-week vacation to Texas, Fuentes traveled to the United States with JRN in tow. On April 7, 2010—the day she was scheduled to return to Sweden—Fuentes sent Norinder a text message saying that she was keeping their son and planned to remain in the United States. Norinder hired a lawyer and for about a month searched for Fuentes and JRN. They were not in Texas or any other place that he might have expected. Eventually, he found them in southern Illinois, and on May 26, 2010, his lawyer there filed the petition for return of the child that is now before us.

## II

That brings us to the district court proceedings and to Fuentes's first argument on appeal. She contends that the district court improperly cut off her pretrial discovery, thereby seriously undermining her ability to show that Norinder poses a grave risk of harm to

JRN. Fuentes frames this as a legal challenge; in her view the district court erred by refusing to apply the Federal Rules of Civil Procedure to the proceedings. That accusation, not surprisingly, is not a fair summary of the district court's rulings.

The district court was properly trying to move this case along on an expedited basis. Norinder's petition was filed on May 26, 2010, and on June 4 the district court set June 22 as the date for the start of a bench trial. (All dates are in 2010, and so we do not repeat that.) On June 8, Fuentes hired a lawyer. A few days later, on June 15, Norinder filed a discovery plan that recommended completing discovery by June 18. On June 16, Fuentes's lawyer filed his first appearance in the case. On June 21, the day before trial was set to begin, Fuentes filed a response to Norinder's petition and in it requested additional discovery for the first time. She said that the court's current schedule would interfere with her effort to gather evidence needed for trial, and her lawyer submitted an affidavit outlining what she was requesting: medical records relating to Norinder's alleged alcohol and drug use; documents that might reveal past domestic violence; Norinder's prescription drug records; and all documentation kept by his employer. On June 22, at the first of five hearings held by the district court over a month-long period, Fuentes requested a continuance, urging again that she needed the additional discovery to proceed with the case.

The district judge denied the request and went ahead with the hearing. Later that day, the court said:

And let's see, now I would like for Dr. Norinder, as soon as we finish today, to execute a waiver or a release for, if the Respondent wishes to have it, for your medical records since January 2008 [the month before JRN's birth], and employment records, any prescription records, any alcohol or drug abuse treatment records, and any legal records relative to any domestic abuse, or any crimes for that matter, and any report of investigations at the hospital in Sweden. And I know those won't be here tomorrow, but I suspect they can be obtained expeditiously.

The hearing resumed on three additional days in June. On June 30, the district court determined that JRN's habitual residence was Sweden and that Norinder had demonstrated that his rights of custody under Swedish law had been violated when Fuentes abducted JRN to the United States. The court limited the remaining proceedings, which were to take place at the end of July, to the question whether JRN would be exposed to a grave risk of harm if he was returned.

All of Fuentes's reasons for seeking more time for discovery before trial related to the grave-risk-of-harm defense—that is, to the part of the case that the court had not yet resolved. On July 14, Norinder produced the medical and employment records that the district court had ordered on the first day of trial; he did not produce any documents relating to past prescription drug use. On July 22, the district court held the final day of hearings to consider whether Norinder posed a threat to JRN. The court concluded that he did not, and on

July 23, it issued an order requiring the return of JRN to Sweden.

Fuentes takes the position that the court's denial of her request for pretrial discovery is an error of law because, she says, the court failed to apply the Federal Rules of Civil Procedure to the case. This argument is a non-starter. There is no question that the Federal Rules of Civil Procedure apply to cases brought under the Act and the Convention in federal court. See *Kijowska v. Haines*, 463 F.3d 583, 589 (7th Cir. 2006); see also *Pielage v. McConnell*, 516 F.3d 1282 (11th Cir. 2008); *Cantor v. Cohen*, 442 F.3d 196 (4th Cir. 2006); *March v. Levine*, 249 F.3d 462 (6th Cir. 2001). But there is also nothing in the district court's opinion that suggests that it was acting outside of the framework established by the Rules. Fuentes made a discovery request on June 21 and the next day asked for more time to pursue that discovery. Such requests occur routinely. As in any case, the question for us is whether the district court's decision to deny additional discovery was an abuse of discretion, *e.g.*, *Walker v. Sheahan*, 526 F.3d 973, 977-78 (7th Cir. 2008). We will reverse a decision only if it resulted in actual and substantial prejudice, *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 646-47 (7th Cir. 2001). See generally FED. R. CIV. P. 61.

Fuentes's arguments in this court are in some tension with one another. On the one hand, she contends that she has shown by clear and convincing evidence that JRN would be harmed if returned to Sweden and that she thus has stated a defense under article 13(b) of the

Convention (an argument to which we return shortly). At the same time, her discovery argument is based on the premise that she was prejudiced by the judge's decision because, had she been given access to records of Norinder's history of alcoholism, drug use, and domestic abuse, she would have been able to show with greater certainty that JRN faced a grave risk of harm in Sweden. In the end, however, we can disregard this problem. Any way one looks at the case, the district court's management was eminently reasonable.

A party who seeks additional discovery must let the district court know in a timely fashion. *E.g.*, *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1058 (7th Cir. 2000). Fuentes's lawyer was aware that a trial date of June 22 had been set at the moment he was hired on June 8 (or he should have made himself aware of that fact); the lawyer had Norinder's expedited discovery plan in hand on June 15, and so he knew that it proposed a completion date for discovery of June 18. It would have been easy to ask the judge for more than three days. Yet Fuentes said nothing about a need for additional discovery until the day before trial and did not request a continuance until the morning it was to start. The district court was under no obligation to push back the proceedings when Fuentes had missed multiple opportunities to tell the court that she needed more time.

Despite the late notice, the district court actually accommodated Fuentes's request for additional information. We quoted above the court's order during the first hearing telling Norinder to produce precisely the

documents that Fuentes contended she needed before trial could begin. The court recognized that those documents could not be retrieved right away, and so it took the additional step of first resolving all of the issues in the dispute that were *unrelated* to the document production it had ordered. The question of grave risk of harm was put off until a week after Norinder produced the requested records. There is no evidence in the record that Fuentes ever objected to the document production order; nor did she suggest after Norinder had furnished the additional documentation that she needed anything more.

And if this were not enough to support the conclusion that the district court did not abuse its discretion by denying additional discovery (and it is), the denial of a continuance was the correct course here because of the time-sensitive nature of the case, filed as it was under an international convention designed to protect children unlawfully abducted to foreign countries. Courts have leeway to limit discovery in many circumstances where the additional discovery would undermine the litigation. See, *e.g.*, *Semien v. Life Ins. Co. of North America*, 436 F.3d 805, 815 (7th Cir. 2006) (ERISA example). The Convention and its implementing Act are chock full of the language of urgency and in no uncertain terms contemplate expedited procedures to guarantee that children are returned quickly to the correct jurisdiction. See, *e.g.*, 42 U.S.C. § 11605 (providing relaxed rules for document authentication); *id.* § 11601(a)(4) (discussing the need for "prompt" return); Hague Convention art. 1 (stating that a purpose of the Convention is "to secure

the prompt return of children wrongfully removed"); *id.*
art. 2 (requiring state parties to "use the most expeditious
procedures available"); *id.* art. 11 ("The judicial or admin-
istrative authorities . . . shall act expeditiously in pro-
ceedings for the return of children."); *id.* art. 18 ("The
provisions of this Chapter do not limit the power of a
judicial or administrative authority to order the return
of the child *at any time*.") (emphasis added). In that
respect, the adjudication of a petition for return of a
child is much like a district court's exercise of equitable
power in the context of a preliminary injunction or a
temporary restraining order. In both circumstances,
discovery often must proceed quickly, the district court
must apprise itself of the relevant facts, and a decision
must be rendered on an expedited basis. The Sixth
Circuit in *March v. Levine* affirmed a district court's deci-
sion to grant summary judgment to a father seeking
return of his children to Mexico under the Convention
without any discovery or evidentiary hearing at all.
249 F.3d at 473-75. Like the Sixth Circuit, we conclude
that an expedited schedule is appropriate when a court
is considering a petition for relief under the Conven-
tion. Nothing about the district court's schedule in this
case was at all objectionable, particularly in light of the
lack of complaint about the materials actually produced.

## III

Fuentes also presents two arguments on the merits of
the district court's decision: first, that it erred by finding
that Sweden was JRN's habitual place of residence, and

second, that it erred by finding that she failed to show by clear and convincing evidence that sending JRN back to his father will expose the child to grave harm, excusing the obligation to return him that would otherwise exist under the Act and the Convention. We address these in turn. We review the court's factual findings (including its credibility findings) for clear error and its conclusion that the facts do not clearly establish a grave risk of harm *de novo*. *Cuellar v. Joyce*, 596 F.3d 505, 509 (9th Cir. 2010).

## A

The Act provides for the return of a child wrongfully removed to the United States in violation of the Convention. 42 U.S.C. § 11603(b). As we explained in *Altamiranda Vale*, wrongful removal is defined as removal "in breach of rights of custody" vested in the party who complains of the removal; to prevent forum shopping, rights of custody are defined according to the law of the country that is the child's "habitual residence." 538 F.3d at 583-84; see also *Kijowska*, 463 F.3d at 585-86. The first step for a court considering a petition is to determine the child's habitual residence. The forum-shopping concern, we have said, means that habitual residence must be "based on the everyday meaning of these words rather than on the legal meaning that a particular jurisdiction attaches to them," *Altamiranda Vale*, 538 F.3d at 583; for example, habitual residence is not necessarily the same as a jurisdiction's conception of "domicile," *Kijowska*, 463 F.3d at 586-87. In *Koch v. Koch*, 450 F.3d 703 (7th Cir.

2006), we discussed in detail how habitual residence should be determined, and we adopted a version of the analysis set out by the Ninth Circuit in *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001). The question is whether a prior place of residence (in this case, the United States) was effectively abandoned and a new residence established (here, Sweden) "by the shared actions and intent of the parents coupled with the passage of time." *Koch*, 450 F.3d at 715. Often parents will not agree about what their shared intentions were once litigation is underway, and so we must take account of the parents' actions as well as what they say. *Id.* at 714.

This case is not a close one. Although JRN was born in Houston, Texas, the family moved to Sweden five months after the child's birth and lived there until the trip Fuentes took that triggered this lawsuit. Fuentes says that the 2008 move to Sweden was supposed to be a temporary relocation and that she never would have gone if she thought it was a permanent move. As a result, she continues, she never shared the intent to abandon the United States as her and JRN's habitual residence. The district court was unconvinced:

> [T]he uncontroverted evidence is that [Fuentes] had at least 80% of her personal items shipped to Sweden in July 2008, including two automobiles. She applied for and received permanent residency status in Sweden as of the end of 2009. She was engaged in negotiations for a position at a hospital in another city [in Sweden] and she and Norinder had looked for homes in that city. She took Swedish lessons right

up to the time she left for the United States. Notably, she did not retain a residence in the United State[s]. She did not have a house, nor was there any evidence introduced of a driver's license, or taxes paid in the United States.

This was enough to convince the district court that Fuentes shared the intent to reside in Sweden with Norinder and JRN. It is enough to convince us as well. That Fuentes or Norinder thought that they might one day return to the United States does not mean that the United States remained the child's habitual residence. *Koch* was a closer case than this one, and there we mentioned that an intention or hope to return does not prevent a new residence from being established. 450 F.3d at 717-19. "When the child moves to a new country accompanied by both parents, who take steps to set up a regular household together, the period [of time the child has been in the country] need not be long." *Mozes*, 239 F.3d at 1078. That logic applies here. The district court's determination that JRN's habitual place of residence is Sweden was not clearly erroneous.

B

Article 13(b) of the Convention and 42 U.S.C. § 11603(e)(2)(A) provide that when a respondent demonstrates by clear and convincing evidence that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation, the automatic return required by the Convention should not go for-

ward. See *Abbott*, 130 S. Ct. at 1997; *Altamiranda Vale*, 538 F.3d at 587; *Baran v. Beaty*, 526 F.3d 1340, 1352-53 (11th Cir. 2008); *Walsh v. Walsh*, 221 F.3d 204, 220-21 (1st Cir. 2000). Fuentes argues that she has met this burden. She bases her assertion that Norinder poses a serious risk of harm to JRN on a handful of serious fights the couple had; an incident in which Fuentes contends that Norinder threw JRN on the ground during an argument; allegations that Norinder is addicted to prescription drugs and that he abuses alcohol; and the testimony of two psychiatrists, Drs. Roth and Woodham, who appeared on Fuentes's behalf at trial. Norinder responds that he is a fit and loving parent; he disputes that he ever threw JRN or harmed the child in any way—in fact he accuses Fuentes of dropping JRN. Norinder presented testimony from his long-time psychiatrist, Dr. Vikander, about his history of drug and alcohol abuse. He asserts that Fuentes fell far short of showing the requisite grave risk of harm required by the Convention.

The district court agreed with Norinder on every point. It found that Fuentes's testimony about Norinder's past behavior was not credible, and it expressly found Norinder's story about who dropped JRN more plausible. The court also thought that Norinder's distant history of drug and alcohol abuse did not suggest that he would harm JRN. It was not persuaded by the testimony of Fuentes's expert witnesses. While they both testified generally about the effect of substance abuse on children, neither had evaluated Norinder in any meaning-ful way—Dr. Woodham had seen Norinder on three occasions in 2008, and Dr. Roth had never interacted with

him at all. The past fights, the court said, were best viewed as "minor domestic squabbles" rather than anything detrimental to JRN. The district court concluded, "[T]here is no credible evidence that this return of the child to the custody of the Petitioner will, in any manner, present a grave risk of harm."

We find no fault in the lower court's factual findings. We said in *Van De Sande v. Van De Sande* that "[c]oncern with comity among nations argues for a narrow interpretation of the 'grave risk of harm' defense; but the safety of children is paramount." 431 F.3d 567, 572 (7th Cir. 2005). Because the court in this sort of case is responsible for determining which country's courts should adjudicate the domestic dispute and not resolving the dispute itself, we have stressed that the risk of harm must truly be grave. *Id.* at 570. The respondent must present clear and convincing evidence of this grave harm because any more lenient standard would create a situation where the exception would swallow the rule. *Simcox v. Simcox*, 511 F.3d 594, 605 (6th Cir. 2007).

Fuentes has not met this demanding standard. She has given us no reason to doubt the district court's credibility findings, including its decision to credit Norinder's testimony over her own and its view that Norinder's long-term psychiatrist provided more accurate information than doctors who had not treated him before. As Fuentes says in her brief, "[E]ven the most objective observer would fairly describe the trial proceedings as a swearing match between Norinder and [Fuentes]." Without some compelling evidence

otherwise, we must agree with the district court's con-
clusion that Norinder never threw JRN on the ground,
and that whatever drinking and drug problems have
existed do not affect the outcome here. There is nothing
in this case like the death threat issued by the father
that was cause for great concern in *Van de Sande,* 431 F.3d
at 570; in fact, this case strikes us as much more like
*Altamiranda Vale*, where we decided that vague evidence
that a petitioner-father had hit his child with a video-
game cord in the past was not enough to support a
defense under article 13(b) of the Convention, 538 F.3d
at 587. Based on the facts it found, the district court's
decision to order JRN returned to Sweden was correct.

## IV

Finally, Fuentes assaults the district court's award of
fees and costs to Norinder. The Act requires courts to
award fees and costs to prevailing parties:

> Any court ordering the return of a child pursuant to
> an action brought under section 11603 of this title
> shall order the respondent to pay necessary expenses
> incurred by or on behalf of the petitioner, including
> court costs, legal fees, foster home or other care
> during the course of proceedings in the action, and
> transportation costs related to the return of the child,
> unless the respondent establishes that such order
> would be clearly inappropriate.

42 U.S.C. § 11607(b)(3). Fuentes challenges the district
court's award from two different angles: first, she objects

to particular line items that Norinder claimed in his motion for fees and costs; and, second, she says that her financial situation is so dire that she should not be required to pay fees or costs at all.

The district court used the lodestar method to calculate attorney's fees and carefully evaluated all of the expenses that Norinder claimed. It reduced the total amount of time billed by Norinder's lawyer and paralegal by 20% and cut the fee charged by the lawyer down to $300 an hour and that charged by the paralegal to $125 an hour. In addition, the court excluded expert witness fees and expenses that were paid to Norinder's psychiatrist because there was not adequate documentation to support the claimed expenses. Norinder's motion was thus granted in part and denied in part: Norinder asked for $170,000 and the court awarded $150,570. Fuentes says that we should reduce that award by "at least $75,000." We review the district court's award for an abuse of discretion. *Wickens v. Shell Oil Co.*, 620 F.3d 747, 753 (7th Cir. 2010).

Fuentes objects in particular to four line items: first, Norinder's paralegal's allocation of 52 hours at $125 per hour for time at trial; second, Norinder's decision to present two Swedish attorneys as experts who could explain the meaning of "rights of custody" under Swedish law; third, the allegedly excessive number of hours that Norinder's attorney billed; and fourth, expenses awarded to the Swedish interpreter who assisted Norinder and his daughter Rebecca (from a prior marriage) during the hearing. The short answer is that the

district court evaluated these arguments and made adjustments where appropriate. For example, it did reduce the paralegal's hours by 20%, knocking 40 hours of work off of the bill. The court similarly did not abuse its discretion by permitting the expert testimony on Swedish law, which was certainly pertinent to the case. Norinder's lawyer asked to be reimbursed for 195 hours, but the district court cut this back to about 155, very close to the 130 that Fuentes thought was reasonable. In addition, the district court rightly pointed out that many of the hours expended at the start of the case, before the petition was filed, were consumed in an effort to locate JRN after he had been spirited off to southern Illinois by Fuentes. As for the interpreter, the district court was in the best position to judge whether those services would be useful to Norinder and Rebecca. It found that they were, and we see no abuse of discretion in that conclusion.

Finally, Fuentes argues that the fee award is so large that it will make it impossible for her to conduct divorce and custody proceedings in Sweden. At least two courts of appeals have recognized that a fee award in a case under the Convention might be excessive and an abuse of discretion if it prevents the respondent-parent from caring for the child. *Whallon v. Lynn*, 356 F.3d 138, 139 (1st Cir. 2004); *Rydder v. Rydder*, 49 F.3d 369, 373-74 (8th Cir. 1995). The district court recognized these cases but decided that, because Fuentes stood to make "in excess of $300,000 a year" following her fellowship, the award of $150,000 would not inflict that sort of harm. Fuentes now tells us that her monthly income is just $3,300, and is consumed almost entirely by expenses and debts. She

does not provide any response, however, to the contention that her salary will soon be much larger. Indeed, Norinder stressed in his brief in this court what the district court had said before: Fuentes herself has said that she will make $300,000 a year. We cannot tell whether this was an exaggeration on Fuentes's part or a realistic projection of her future salary. Tellingly, Fuentes has not provided any sort of rebuttal to this claim in this court, and her silence suggests that the fee award is not a substantial problem. With nothing in the record causing us to think that the award will have a detrimental impact on JRN, we conclude that the district court acted within its discretion when it awarded costs and fees to Norinder.

AFFIRMED.