HAMILTON, Circuit Judge,
dissenting.
I respectfully dissent from the decision to reverse and remand this case to the *789 district court. My colleagues and I agree that the child’s country of habitual residence is Canada and that the mother’s removal of the child from India to the United States violated the father’s rights as a parent. The disputed issue is the mother’s “grave risk” defense to what is otherwise a rock-solid Hague Convention case for return of the child to Canada. I would affirm the district court’s finding that the mother did not prove the “grave risk” defense by clear and convincing evidence and would affirm the order returning the child to Canada. I would allow that nation’s courts to address this child’s best interest and to decide on custody, support, visitation, and all related matters without further delay.
As I explain in detail below, the temptation we face with this case is one that was anticipated by the diplomats and family law experts who drafted the Hague Convention and by the United States Congress that enacted the implementing legislation. The temptation is to decide the merits of the underlying custody dispute, and to do so based on the best interest of the child. That sounds at first like a humane and sensible way to decide the case. But for cases involving abductions, the Convention and the legislation were drafted as tightly as possible to discourage courts from deciding the best interest of the child. The Convention and the legislation are designed to decide venue, and to decide it quickly, to deter forum-shopping in custody disputes by way of international child abductions. The right venue is ordinarily the country of the child’s habitual residence. Although there is an important exception where a return to that country would pose a “grave risk” to the child, that exception was drafted carefully to keep it narrow, precisely so as to prevent courts deciding Hague Convention petitions from reaching too far into the merits of the custody question.
My colleagues’ decision to reverse is based on the noblest of motives, to protect a vulnerable child from a potential threat and to try to act in her best interest. Despite my colleagues’ disclaimers that the reversal is only a procedural decision, though, the reversal does what Hague Convention courts are not supposed to do. The reversal is also clearly based on the view that the district judge who saw and heard the witnesses was simply wrong in his evaluation of the parties’ credibility— an evaluation we can make only by reading and re-reading transcripts.
I do not know whether the district judge was right or wrong in his factual evaluation of credibility. I will cheerfully concede that, based on all we know about this troubled family, a family court judge who considers the best interest of the child (whether in Canada or the United States) is likely to award custody to her mother, at least on an interim basis while the divorce goes forward. The law could not be any clearer, however, that that is not the question for the district court or for us to decide. Our job and the district court’s job is to decide only the narrow questions presented by the Hague Convention petition.
For the district court, this was a difficult ease. Based on the district court’s findings, our job on appeal in this case should be much easier. We should respect the district court’s findings and allow the family courts in the Canadian province of Alberta to do their job, which is the more difficult one of deciding all the issues of child custody, support, and visitation in the divorce case. By instead broadening the issues in this case, as the majority does, we tend to undermine a critical provision of the Hague Convention and invite other parents who have abducted their children to do the same in future cases. To explain *790 my reasons in more detail, I address first the “grave risk” exception as it evolved in the Hague Convention, whose proceedings show that our obligation under international law is to resist the lure of deciding custody based on a broad inquiry into the best interest of the child. I turn then to the majority’s specific criticisms of the district court’s handling of this case.
I. The Narrow Exception for “Grave Risk”
A close look at the proceedings that led to the Hague Convention shows that its framers and ratifiers foresaw the path my colleagues take in this case, warned against it, and drafted language as clearly as they could to prevent courts from broadening a Hague Convention case into a complete and prolonged custody battle.
The basic premise of the Hague Convention is to protect the best interests of all children by removing the incentive to abduct children involved in custody disputes and to return an abducted child to her country of habitual residence, promptly, and without attempting to determine merits of the underlying custody dispute. 42 U.S.C. § 11601(a)(4); Blondin v. Dubois, 189 F.3d 240, 245 (2d Cir.1999); Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cir.1993); Fabri v. Pritikin-Fabri, 221 F.Supp.2d 859, 863 (N.D.Ill.2001). The central provision of the Convention, Article 12, provides what is known as the return remedy: “Where a child has been wrongfully removed or retained in terms of Article 3 ... the authority concerned shall order the return of the child forthwith.” See Abbott v. Abbott, — U.S. -, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010).
In drafting the Convention, it was recognized, of course, that there could be exceptional circumstances in which the return remedy should be denied, including cases where return would endanger the child. The drafters considered a number of different formulations for this exception. Their debates show that they recognized that if the exception were drafted or interpreted too broadly, it could effectively undermine the entire Convention.
The drafters first considered “substantial risk” and other, even less demanding formulations in the English texts of the proposals, such as exceptions for the best interests of the child or for the forum nation’s public policy. Those less demanding standards were all rejected in favor of the “grave risk” language in Article 13(b). They were rejected precisely because they would create too great a risk that the courts would delve into the merits of the ultimate custody determination. See, e.g., 1980 Conference de La Haye de droit international prive, Enlevement d’enfants, in 3 Actes et Documents de la Quatorziéme session (“Actes”), pp. 168, 182-83, 203-04, 362 (1982).[1]
These concerns are clear in participating nations’ comments on the earlier, less demanding standards. Germany, for example, provided a warning that predicts our handling of this case:
The wider and vaguer the provision is worded, the greater the margin for the ‘abductor’ successfully to resist the return of the child. In the interest of an effective ‘functioning’, therefore, the exceptions should be restricted as closely as possible and only the situations really worthy of an exception should be provided for.
This is also in accordance with the purpose of the Convention to return the *791 child as quickly as possible. The wide scope of discretion now left to the competent authorities under [the “substantial risk” exception] may result in a considerable delay of the return. Expert opinions may be called for as well as second opinions by other experts which will take much time, investigations of fact may be made by which matters could easily be delayed.
Actes p. 216 (emphasis added). Of particular interest to our Congress or to United States courts, perhaps, are the comments of the United States delegation, which sharply criticized the early “substantial risk” proposal:
The United States is seriously concerned about the far-reaching inroads [the article that later became Article 13] makes into the ‘prompt return’ principle. The very objects of the Convention may be defeated if this article is adopted in its present form. As the Swiss Delegate, Mr Beachler, stated in 1976, the status quo ante must be re-established before there is any other discussion. Only after the return of the child to the country of origin may the merits be considered.
[This article] retains little of the ‘restoration of custody’ concept or of ‘prompt return’ without examination of the merits. Its broad exceptions will tend to turn virtually every return proceeding into an adversary contest on the merits of the custody question. No abductor’s lawyer would fail to raise one or more of the exceptions.
Actes p. 242 (emphasis added; citation omitted).
The Convention adopted the stricter “grave risk” standard to prevent or at least discourage such efforts to broaden the scope of court proceedings seeking return of a child. The drafters were familiar with the practice of courts relying on such broad standards to resist demands that abducted children be returned to their countries of habitual residence. Actes pp. 182-83. The Convention was designed to end that practice. The Explanatory Report for the final text of the Convention explained:
[I]t must not be forgotten that it is by invoking ‘the best interests of the child’ that internal jurisdictions have in the past often finally awarded the custody in question to the person who wrongfully removed or retained the child. It can happen that such a decision is the most just, but we cannot [ignore] the fact that recourse by internal authorities to such a notion involves the risk of their expressing particular cultural, social etc. attitudes which themselves derive from a given national community and thus basically imposing their own subjective value judgments upon the national community from which the child has recently been snatched.
Actes p. 431. On the exception for grave risk, the Explanatory Report warned more specifically against expansive interpretation:
To conclude our consideration of the problems with which this paragraph deals, it would seem necessary to underline the fact that the three types of exception to the rule concerning the return of the child must be applied only so far as they go and no further. This implies above all that they are to be interpreted in a restrictive fashion if the Convention is not to become a dead letter. In fact, the Convention as a whole rests upon the unanimous rejection of this phenomenon of illegal child removals and upon the conviction that the best way to combat them at an international level is to refuse to grant them legal recognition. The practical application of this principle requires that *792 the signatory States be convinced that they belong, despite their differences, to the same legal community within which the authorities of each State acknowledge that the authorities of one of them — those of the child’s habitual residence — are in principle best placed to decide upon questions of custody and access. As a result, systematic invocation of the said exceptions, substituting the forum chosen by the abductor for that of the child’s residence, would lead to the collapse of the whole structure of the Convention by depriving it of the spirit of mutual confidence which is its inspiration.
Actes pp. 434-35 (emphasis added).
Turning from the Hague Convention itself to its implementation by the United States, the Congress emphasized these same points, recognizing the temptation to turn Hague Convention proceedings into full-blown custody fights. Congress found that children who have been wrongfully removed or retained “are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.” 42 U.S.C. § 11601(a)(4). Congress declared: “The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims.” 42 U.S.C. § 11601(b)(4). The State Department advised Congress that the exceptions were “drawn very narrowly lest their application undermine the express purposes of the Convention — to effect the prompt return of abducted children,” and that Convention delegates believed that “courts would understand and fulfill the objectives of the Convention by narrowly interpreting the exceptions and allowing their use only in clearly meritorious cases, and only when the person opposing return had met the burden of proof.” Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed.Reg. 10,494, 10,509 (March 26,1986). More specifically on the “grave risk” exception, the State Department explained:
This provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child’s best interests. Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court’s determination. The person opposing the child’s return must show that the risk to the child is grave, not merely serious.
Id. at 10,510.[2]
One critical provision of the implementing legislation in the United States dealt with burdens of proof. In implementing the “grave risk” exception, Congress imposed on a respondent (the mother in our case) the burden of proving the exception “by clear and convincing evidence.” 42 U.S.C. § 11603(e)(2)(A) (referring to Article 13(b) of the Convention). That demanding standard of proof was properly the focus for the district court and should be our focus as well. The choice to impose that high burden of proof was designed to make a difference, and it should make a difference, in cases exactly like this one where it is difficult to make a reliable factual determination.
Reasonable people may debate whether the “grave risk” standard is sufficiently sensitive to legitimate claims of abuse, without being over-sensitive to false or *793 exaggerated claims. Some of the advocates’ and scholars’ law journal articles cited by the majority argue that the “grave risk” standard is too difficult for victims of domestic violence to satisfy. See, e.g., Karen Brown Williams, Fleeing Domestic Violence: A Proposal to Change the Inadequacies of the Hague Convention on the Civil Aspects of International Child Abduction in Domestic Violence Cases, 4 J. Marshall L.J. 39 (2011); Roxanne Hoegger, What if She Leaves ? Domestic Violence Cases Under the Hague Convention and, the Insufficiency of the Undertakings Remedy, 18 Berkeley Women’s L.J. 181 (2003); Merle H. Weiner, International Child Abduction and the Escape from Domestic Violence, 69 Ford-ham L.Rev. 593 (2000). As the majority points out, the proportion of international child abduction cases where the abductor is herself fleeing a violent or psychologically abusive situation has grown much higher than was anticipated by the Convention or by Congress. The demanding “grave risk” standard, requiring proof by clear and convincing evidence, creates the possibility that abusive parents could use the Convention, which was enacted to protect children, to have courts order those children back into harm’s way.
The Convention drafters were aware of this possibility. The “grave risk” exception was a compromise designed to address the problem narrowly, without inviting abducting parents and their lawyers to broaden litigation over the return remedy to include a full custody battle. The drafters recognized that allowing such broader litigation would undermine the ability of the Convention to protect those other children who are abducted by their abusers or by parents who seek to use them as leverage. Our job, of course, is to apply the Convention and the legislation themselves, not the scholarly criticisms and proposals for improvements in them. See also Merle H. Weiner, Navigating the Road Between Uniformity and Progress: The Need for Purposive Analysis of the Hague Convention on the Civil Aspects of International Child Abduction, 33 Colum. Hum. Rts. L.Rev. 275, 279-80 (2002) (noting concern about effects of judicial manipulation of the Convention in cases involving claims of domestic violence).
Before moving to the specifics of our case, and the majority’s criticisms of the district court’s handling of this case, one should not forget the Hague Convention’s emphasis on prompt decisions. Article 11 provides: “The judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for the return of children.” What is expeditious? Article 11 provides further that if the entire petition is not decided within six weeks from the start of the proceedings, the interested parties and countries have a right to an explanation for the delay. That’s a mild sanction, but it certainly gives us a target. In this case we are already well past that point, and the reversal here points toward more weeks or months of litigation in the district court.
That need for a prompt decision on the remedy of return gives district courts a good deal of flexibility in deciding the procedures they will use to decide these petitions. In Norinder v. Fuentes, 657 F.3d 526 (7th Cir.2011), for example, we affirmed the remedy of return after expedited proceedings with limited and expedited discovery. We said: “The Convention and its implementing Act are chock full of the language of urgency and in no uncertain terms contemplate expedited procedures to guarantee that children are returned quickly to the correct jurisdiction.” Id. at 533. In essence, a district judge facing a Hague Convention petition should ordinarily use the expedited procedures that apply to motions for temporary restraining *794 orders and preliminary injunctions. Our appellate review of the procedural choices should respect the time pressures and allow for some flexibility, some discretion, and even some imperfections.
II. The District Court’s Decision
The district court faced the following situation. The father easily proved his prima facie case of entitlement to the return remedy. The child’s habitual residence has been Canada, and the mother removed the child from the father’s custody in violation of his rights as a father (under Canadian law) when she took the child during the family trip to India and flew to her parents’ home in the United States. The hearing transcript shows that the judge knew he was supposed to act quickly and that his job was most emphatically not to decide the merits of the underlying custody dispute between the parents. The only serious issue was whether the mother proved by clear and convincing evidence that returning the child to her father in Canada would pose a grave risk to her physically or psychologically. On that issue, the district judge heard testimony for a day. At the end of the hearing, he stated his oral finding that the mother had not proved her defense by clear and convincing evidence. The next day he issued a short written order repeating that finding.
The majority identifies three distinct errors by the district court: (a) failing to make sufficiently specific findings; (b) overlooking a warning in one of our cases not to rely on police and laws of the country of habitual residence to protect a child; and (c) refusing to delay a ruling to give the mother’s expert time to conduct a psychological evaluation of the child. As I read this record, the district judge did not commit such reversible errors.[3]
A. Sufficiency of Findings
The majority’s strongest argument is that the findings were not specific enough and that the judge should have explained in more detail his view of the facts and the testimony of the witnesses. If all we had were the two-page written order, I would agree that more was needed. But we also have more detailed oral explanations that emerged at the end of the hearing as the judge announced his decision, the mother’s lawyer argued that the decision was mistaken, and the judge explained his reasoning further. In my view, the transcript is sufficient to understand the judge’s thinking. It shows that the judge understood the evidence, understood the law, and did not clearly err by finding that the mother had not proved by clear and convincing evidence that return would pose a grave risk to the child.
Federal Rule of Civil Procedure 52(a) allows for oral findings. It requires findings on as many of the subsidiary facts as are necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue. Ortloff v. United States, 335 F.3d 652, 661 (7th Cir.2003), abrogated on other grounds, Ali v. Federal Bureau of Prisons, 552 U.S. 214, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008), as stated in Parrott v. *795 United States, 536 F.3d 629, 635 (7th Cir.2008). The sufficiency of findings must be evaluated in context, keeping in mind the substantive issues and the burden of proof. See American Red Cross v. Community Blood Center of the Ozarks, 257 F.3d 859, 863 (8th Cir.2001) (oral findings at end of one-day hearing were sufficient given the limited proceedings). Findings are to be liberally construed in support of a judgment, even if those findings are not as detailed as we might desire. Zack v. C.I.R., 291 F.3d 407, 412 (6th Cir.2002) (affirming judgment); Grover Hill Grain Co. v. Baughman-Oster, Inc., 728 F.2d 784, 793 (6th Cir.1984) (reversing judgment where findings did not give clear understanding of basis for district court’s decision); Travelers Ins. Co. v. Dunn, 228 F.2d 629, 631-32 (5th Cir.1956) (affirming judgment where district court stated oral finding that appellee had “testified truly”). Given the urgency of the matter the district judge had to decide, we should read his findings more charitably than my colleagues do so long as we can follow the path of his reasoning. That path is easy to follow here. The mother had to prove her defense by clear and convincing evidence. The conflicts in the evidence about the father’s treatment of the mother over the years of their marriage, and the credibility issues raised with both of them, meant that her evidence was not clear and convincing.
The judge began to summarize his view of the case at page 214 of the transcript. He said that if he were sitting in Canada as a family court judge, he would probably award custody to the mother. Tr. 215. He continued: “But as I understand the law, and I’m reading from Judge Posner’s opinion [in Van De Sande v. Van De Sande, 431 F.3d 567 (7th Cir.2005) ], that the exception is the child is to be returned except where there’s grave risk of harm to the child.” So far, so good. He continued: “And, now, there’s — presumably, there’s always some risk. All I know is what I heard today. And I’m — there’s been a he said/she said hearing today. And it’s very difficult for me to say categorically one side is telling the truth and one side is not telling the truth. And the burden is— there’s extraordinary burden on the part— to establish that defense of grave risk of harm.” Tr. 215-16. Again, no error yet, and note the critical reference to the burden of proof the mother faced.
Did the judge say enough about the only neutral witnesses, the two visitation supervisors? The mother sought to show with their testimony that the child had been traumatized by her father’s behavior and that she had spontaneously cried out that he had hurt her. The supervisors’ testimony shows that the child is now much more comfortable with her mother than with her father. Tr. 101-04, 143. That is not necessarily surprising after the child’s long absence from the father after the abduction and the sudden change of custody ordered by the district court, as at least one supervisor, Ms. Soto, recognized. Tr. 102-04.
The judge reasonably described Ms. Kelly’s testimony about possible physical abuse as speculative, Tr. 216, and he noted further: “But there’s been no evidence whatsoever that anything physically was ever done to this child, possibly except squeezing an arm, and that was disputed. But even assuming that there was squeezing of an arm, that’s far short of what I would consider establishing grave risk of harm.” Tr. 219. That is a reasonable view of the evidence, which was not nearly as clear or strong as the mother argues, and it is a reasonable application of the legal standard to that evidence.
The judge did not specifically address the testimony of Ms. Soto, who supervised *796 a visit two days before the hearing. Ms. Soto testified that the child was very happy to see her mother, did not want to go home with her father, and became hysterical when told it was time to meet her father. Tr. 98. Ms. Soto testified that the child’s behavior went beyond separation anxiety and she seemed traumatized. On cross-examination, however, she acknowledged that she would not expect smooth transitions from one parent to another with a young child who has been separated from one parent for 11 months, and when given the opportunity, she did not assert that she thought the child had been abused by her father. Tr. 103-04. Ms. Soto’s testimony was so inconclusive that I see no error in failing to address it specifically.
The majority seems most concerned with the lack of a finding that either the mother and her family were telling the truth or the father was telling the truth, criticizing the judge for invoking an “uncertainty exception” to the findings requirement of Rule 52(a). “If the mother’s testimony about the father’s ungovernable temper and brutal treatment of her was believed, it would support an inference of a grave risk of psychological harm to the child if she continued living with him.” Op. at 786.
Not all courts would necessarily agree with that view of the mother’s testimony here. See, e.g., Gaudin v. Remis, 415 F.3d 1028, 1035 (9th Cir.2005) (“the question is whether the child would suffer ‘serious abuse,’ that is ‘a great deal more than minimal’”) (citations omitted); id. at 1037 (grave-risk inquiry should focus on short-term risk pending opportunity for home country’s courts to address interim custody issues). At least for purposes of argument, though, I will accept the majority’s latter point about possible psychological harm to the child from short-term custody with the father pending a decision by a Canadian court on interim custody. The problem is that the majority’s criticism loses sight of the critical point here: the burden to prove “grave risk” to the child by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). With that standard of proof, the judge simply was not required to find that the mother’s testimony was either true or false, accurate or mistaken. Faced with conflicting evidence from both the mother and the father, each of whose testimony was weakened by inconsistencies and the conflicting testimony of the other, it’s hard to argue with the finding that the mother’s evidence was not “clear and convincing.”
We might wish that the judge had made a crisp call of ball or strike, true or false, but that is not a realistic view of the applicable standard as applied to this conflicting evidence. The district judge was not creating a new “uncertainty exception” to Rule 52(a), as the majority suggests. He was simply applying the clear and convincing burden of proof to evidence that he found neither clear nor convincing.
By imposing the requirement of clear and convincing evidence, Congress was creating a logical space for exactly this sort of finding: the mother might be telling the truth, or so a judge might find by a preponderance of the evidence, but her evidence is still not so persuasive as to be clear and convincing. We might not like that result. Like some of the advocates and scholars cited by the majority, we might think that the Convention and the Congress should have made it easier to prove the defense. But under the controlling burden of proof, the defense to the return remedy was not proven. The district judge clearly understood the burden of proof and applied it to reject the defense. I do not see a reversible error there. A more detailed oral or written review of the conflicts in the evidence ex *797 plaining in more detail why the mother’s evidence was not clear and convincing would not have helped the district judge or us.[4]
B. Overlooking a Warning?
The majority next suggests that the district judge may have made a legal error, that he may have “overlooked our warning in Van De Sande v. Van De Sande, supra, 431 F.3d at 570-71, not to treat the Hague Convention as a venue statute designed ‘to deter parents from engaging in international forum shopping in custody cases.’ ” Op. at 788, quoting Baxter v. Baxter, 423 F.3d 363, 367 (3d Cir.2005). The Hague Convention is indeed a venue statute. It is designed to deter exactly such forum-shopping and to prevent litigation of custody in the country chosen by the abducting parent, as the Third Circuit explained in Baxter. Accord, e.g., England v. England, 234 F.3d 268, 271 (5th Cir.2000); Lops v. Lops, 140 F.3d 927, 936 (11th Cir.1998). The quoted passage in Van De Sande addressed a different issue, an argument that a court could decide “grave risk” and venue by asking only if the country of habitual residence had sufficient laws and police to protect the child from a parent’s abuse.
It is unclear from the Van De Sande opinion whether the father actually made that argument in that case (the target of the discussion was dictum in another circuit’s opinion), but in any event the district judge did not make the supposed error here. The judge was thoroughly familiar with Van De Sande. He referred to it repeatedly during the hearing. The majority suggests the judge made this mistake when he asked: “Why can’t Canada any more than Illinois protect — offer her protection?” Tr. 218. In context, it is clear that the judge was referring to the mother, not to the child. (The judge’s preceding question was “Why can’t she move to Canada?”, referring obviously to the mother.) The question was raised as part of the judge’s proper effort to satisfy himself that a Canadian family court could quickly take steps to deal with interim questions such as custody, support, including paying needed legal fees. See Tr. 212-13, 218, 220-22.[5] There is no doubt that the mother here would face substantial obstacles litigating in the country of habitual residence, away from her parents. She would need to find a place to live and a lawyer, and she probably would need an award of interim support. But those obstacles are surmountable and in any event are not legitimate grounds for denying the Hague Convention’s return remedy.
C. Refusing Further Delay for More Evidence
At the beginning of the hearing, the judge granted the father’s motion to exclude testimony from the mother’s psychological expert, Dr. Hatcher. Because Dr. Hatcher had not interviewed the mother or *798 the child or anyone else involved in the case, the district court found that the proffered expert opinions would not be helpful. Tr. 7-8. Near the end of the hearing, after the judge had said that grave risk had not been shown, the mother’s lawyer asked for another week for Dr. Hatcher to conduct a psychological evaluation of the child and submit a report to the court. Tr. 221. The majority finds that the district judge erred by not allowing such a delay. The judge provided a sound reason for not doing so. After discussion back and forth, the court explained: “Based upon what I know of experts, then they come up with an expert, and then you’re right back where we started from. One will say that there is, and the other will say there isn’t.” Tr. 224. The judge was clearly indicating that waiting for such an evaluation would lead, at a minimum, to several more weeks of delay to allow for the mother to arrange for that evaluation, for the father to arrange for a similar evaluation, for exchanges of expert reports, and for another evidentiary hearing before the district court. In other words, the judge recognized, he would be hearing a full-blown custody fight, which simply was not his job under the Hague Convention. He was correct, and he certainly did not abuse his discretion.
The finding of error on this point is the most troubling aspect of the majority’s decision, in terms of the overall effectiveness of the Hague Convention. The Convention is undermined by expanding the “grave risk” exception into a thorough inquiry into the merits of the custody issue. By finding that the refusal to delay the decision for such additional expert testimony was an abuse of discretion (though the majority does not use that phrase), the expansion of virtually any “grave risk” defense into a full-blown custody hearing becomes nearly inevitable. As explained above in Part I, that was the prediction of the United States delegation to the Hague Convention when the exception was drafted more broadly. Both the Convention and Congress rejected that broader approach. They insisted that the exception be kept narrow and that decisions be made quickly. Under the majority’s approach, however, those goals may be missed any time one parent complains that the other has abused her or him in any way that could have affected the child psychologically. The idea that a decision could be made within the target period of six weeks will become a distant memory.
If the majority’s approach prevails, those consequences may well echo to the detriment of United States parents whose children are abducted to other countries. An important point for the Congress in implementing the Convention was that a foreign court must comply with its obligation to return a child to the United States “without conducting any proceedings on the merits of the underlying custody claims.” 134 Cong. Rec. S3839-02 (daily ed. Apr. 12, 1988) (statement of Sen. Dixon). Many other members of Congress recounted problems their constituents had encountered because their children had been abducted to other countries that refused to return the children without full consideration of custody issues under foreign law. See Weiner, 69 Fordham L.Rev. at 603-04 (collecting examples). If the United States courts do not respect the limits of Hague Convention proceedings, it will be difficult to argue in foreign courts or through diplomatic channels that other nations’ courts should respect them.
I do not mean to exaggerate predictions of doom here. Perhaps the majority’s reasoning on this point can be confined to the combination of the allegations, corroborating evidence, procedures, and findings in this case. The majority does not suggest that the refusal of more time for psycho *799 logical evaluation was alone a sufficient basis to reverse. Yet the risk to the Convention and to the other children and parents it is supposed to protect is nonetheless serious. For these reasons, I would affirm the judgment of the district court and allow the Canadian courts to do their difficult job in dealing with this child and her family.

. Such negotiating records can be helpful in interpreting disputed terms in international treaties. E.g., Sale v. Haitian Centers Council, Inc., 509 U.S. 155, 184-87, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993).

. The executive branch’s interpretation of a treaty is entitled to "great weight." Abbott, 130 S.Ct. at 1993, quoting Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 185, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982).

. I believe the district court made an error at the outset of the case, but one that is now moot. The father filed with his petition under the Hague Convention a request that he be given immediate custody of the child before the mother could be heard, ostensibly on the ground that she posed a flight risk and might take the child back to India, which is not a party to the Hague Convention. The showing of flight risk was thin, but even if there was a flight risk, the much less drastic step of seizing the mother's and child's passports should have been sufficient to preserve the status quo until the mother could have been heard on the interim custody issue.

. The majority also criticizes the district court for mistakenly finding that none of the parties was a resident of Illinois. The mother is a United States citizen and has been residing in Illinois since May 2011, but she is, or at least was, also a permanent resident of Canada, which the district court properly found was the habitual residence of the child. In light of the Hague Convention's standards based on habitual residence, which the district court applied correctly, there was no prejudicial error here.

. Judge O’Scannlain explained for the Ninth Circuit in Gaudin v. Remis, "because the Hague Convention provides only a provisional, short-term remedy in order to permit long-term custody proceedings to take place in the home jurisdiction, the grave-risk inquiry should be concerned only with the degree of harm that could occur in the immediate future," particularly in the context of concern about psychological harm. 415 F.3d at 1037.