**Roger Francisco Barrios GIL, Petitioner,**

v.

**Diana Del Valle Matheus RODRIGUEZ, Respondent.**

**No. 6:02–cv–8–Orl–18KRS.**

United States District Court, M.D. Florida, Orlando Division.

Jan. 22, 2002.

Stephen J. Cullen, Carlos G. Stecco, Miles & Stockbridge P.C., Thomas M. Burke, Holland & Knight LLP, Orlando, FL, for Petitioner.

Hernan Cores Rodriguez, Orlando, FL, for Respondent.

## ORDER

PRESNELL, District Judge.

**THIS CAUSE** came before the Court on Roger Francisco Barrios Gil's ("Petitioner") Petition for the Return of Child. (Doc. 1.) Petitioner alleged that the child's mother, Diana del Valle Matheus Rodriguez ("Respondent"), wrongfully removed their daughter Diana Anaid Barrios Matheus ("Diana") from Venezuela. (Doc. 1, filed January 7, 2002.) On January 16, 2002, the Court held an evidentiary hearing on this matter.[1]

---

1. Between Petitioner's first filing and the evidentiary hearing, the Court issued two Orders. (Doc. 4, Doc. 9.) On January 8, 2002, the Court entered an Order requiring respondent to appear at a hearing on January 10, 2002. The Court also ordered Respondent to surrender her passport and all other travel documents. (Doc. 4.)

Respondent, represented by counsel, complied with the Court's Order and filed an answer. (Doc. 8.) Respondent also surrendered Diana's passport, and Petitioner surrendered his passport. The Court entered a supplemental Order forbidding either party to leave the Orlando Division of the Middle District of Florida. Furthermore, the Court

## I. *BACKGROUND*

Diana was born on May 10, 1994. Petitioner and Respondent never married, but both parents have been actively involved in Diana's upbringing. For the first six years of Diana's life, Petitioner, Respondent and Diana lived together intermittently.[2] During this time, Petitioner was actively involved in every facet of Diana's life. He picked her up from school on a daily basis and participated in school activities. He accompanied her to doctor's appointments. He exclusively financed her educational, medical and living expenses.

In July, 2000, Petitioner, Respondent and Diana moved into an apartment in Valencia, Carabobo State, Venezuela. Uncontroverted evidence, including testimony from Aurora Sierra de Muñoz, the landlord of this apartment, established that for ten months, Petitioner, Respondent and Diana resided together as a family in this apartment.

On April 27, 2001, Respondent took Diana to school. Respondent alerted Petitioner that because she planned to take Diana to her mother's house, Petitioner did not need to pick Diana up from school. Shortly thereafter, Petitioner noticed that many of Diana and Respondent's possessions were missing from the family home. Petitioner called Respondent, but her cell phone had been disconnected. He visited Respondent's mother's house, but nobody was home. On May 3, 2001, Petitioner visited local airports and learned that Respondent and Diana had flown to Miami, Florida. Petitioner knew that Respondent had family members in Florida, and attempted to contact them about Diana's whereabouts. Although he was able to speak to one of Respondent's relatives, they did not reveal Diana's location.

On June 24 or 25, 2001, Respondent called Petitioner and informed him that she and Diana were in Florida, and that he should come to visit. When Petitioner arrived at a designated meeting place on June 28, 2001, Florida law enforcement officers served him with a Temporary Injunction for Protection against Domestic Violence filed by Respondent. (Doc. 14, Exhibit 8.) Petitioner and Respondent appeared before a Circuit Court Judge on July 9, 2001. The Circuit Court dismissed the case against Petitioner for want of jurisdiction. (*Id.*) Petitioner returned to Venezuela without seeing Diana.

Upon his return, Petitioner hired a private investigator, who eventually determined that Diana and Respondent were residing in Kissimmee, Florida. Petitioner finally learned of Diana's whereabouts on December 22, 2001. Meanwhile, Petitioner initiated proceedings in Venezuela to define his custodial rights. A Venezuelan Superior Court dismissed his petition, stating that he did not possess custody rights over Diana. (*Id.*, Exhibit 12.) A Venezuelan Court of Appeals reversed this decision and remanded the case to Superior Court. (*Id.*)

## II. *LAW*

 Congress enacted the International Child Abduction Remedies Act ("ICARA") to implement the Hague Convention on the

---

ordered three visits between Petitioner and Diana. Two visits were supervised by Respondent's mother and one visit was unsupervised. (Doc. 9.)

**2.** Exactly how often Petitioner, Respondent and Diana lived under the same roof from May, 1994 to July, 2000 is a disputed fact. Petitioner contends that with the exception of a six month period after Diana's birth and a two-and-a-half month period in 1998 when Respondent unilaterally removed Diana to Florida, their cohabitation was uninterrupted. Respondent states that with the exception of three months in 1996 and seven months during 1999, she and Petitioner maintained separate residences.

Civil Aspects of International Child Abduction ("Hague Convention"), a treaty to which the United States and Venezuela are signatories. 42 U.S.C. § 11601(b)(1) (West 2001). The objectives of the Hague Convention are: 1) to secure the prompt return of children wrongfully removed or retained in any Contracting State; and 2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States. *Hague Convention on the Civil Aspects of Child Abduction*, Oct. 25, 1980, Art. 1, §§ a-b, T.I.A.S. No. 11670, *available at* 1988 WL 411501. Furthermore, the Hague Convention seeks to restore the pre-abduction status-quo and to deter parents from crossing borders in search of more sympathetic courts. *See Lops v. Lops*, 140 F.3d 927, 936 (11th Cir.1998)

The Hague Convention and ICARA apply where a child has been removed from her habitual residence in breach of the petitioner's custody rights. *Hague Convention*, Art. 3. A petitioner establishes a prima facie case of wrongful removal by demonstrating by a preponderance of the evidence that: 1) the habitual residence of the child immediately before the date of the alleged wrongful removal was in the foreign country; 2) the removal breached the petitioner's custody rights under the foreign country's law; and 3) the petitioner exercised custody of the child at the time of her alleged removal. 42 U.S.C. at § 11603(e)(1)(A); *Lops*, 140 F.3d at 936 (*quoting Hague Convention*, Art. 3)); *Pesin v. Osorio Rodriguez*, 77 F.Supp.2d 1277, 1284 (S.D.Fla.1999), *aff'd* 244 F.3d 1250, 1253 (11th Cir.2001). A petitioner's custody rights may arise by operation of law, judicial or administrative decree, or by private agreement. *Hague Convention*, Art. 3. Children who are wrongfully removed under the provisions of the Hague Convention shall be promptly returned unless one of the exceptions provid-

ed in the treaty applies. *See* 42 U.S.C. at § 11601(a)(4).

A respondent may avoid returning the child to petitioner if respondent can demonstrate by clear and convincing evidence that: 1) return would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation" or; 2) if the child objects to return and is of sufficient age and maturity to do so; or 3) if return would not be permitted by fundamental American principles concerning the protection of human rights and freedoms. *Id.* at § 11603(e)(2). Furthermore, to avoid return, a respondent may demonstrate by a preponderance of the evidence that: 1) more than one year has elapsed since the child's removal and the child is settled in her new environment or; 2) the petitioner does not really have custody rights; or 3) petitioner has consented or acquiesced to the removal. *Id.*

██ This Court has proper jurisdiction over ICARA proceedings. *Id.* at § 11603(a); *Lops*, 140 F.3d at 936. This jurisdiction exists, however, only to determine the merits of the abduction claim and not to consider the underlying custody dispute. *Lops*, 140 F.3d at 936; *Hague Convention*, Art. 19.

### III. DISCUSSION

Petitioner and Respondent stipulated that Diana habitually resided in Venezuela prior to her removal in May, 2001. (Doc. 15.) Furthermore, Respondent invoked none of the exceptions to the Hague Convention or ICARA. Therefore, in order to prevail, Petitioner must demonstrate by a preponderance of the evidence that: 1) Respondent's removal of Diana breached Petitioner's custody rights under Venezuelan law; and 2) Petitioner was exercising custody over Diana at the time of her removal. Petitioner has met this burden.

### A. Venezuelan Custodial Rights

■ By unilaterally removing Diana from Venezuela in May, 2001, Respondent breached Petitioner's custody rights under Venezuelan law.[3] The Venezuelan Constitution states that the father and mother of a child have a shared and irrevocable duty to raise, educate, support and assist their children. *Republic of Venezuela Const.,* Art. 76. Venezuelan law describes these responsibilities and obligations as *Patria Potestas* (parental authority). *See Organic Law for the Protection of Juveniles and Adolescents* (hereinafter "Organic Law"), § 1, Art. 347. "*Patria Potestas* encompasses the guardianship and representation of the offspring who are the subject of said *Patria Potestas,* as well as the management of the offspring's property." *Id.* at § 1, Art. 348. Guardianship, in turn, refers to "custody, material assistance, vigilance and moral as well as educational guidance.... Exercising parental authority requires direct contact with the offspring, and therefore the ability to decide their place of residence or domicile." *Id.* at § 2, Art. 358.

Undoubtedly, Petitioner fully exercised *Patria Potestas* over Diana. Uncontroverted testimony established that he actively and directly participated in every meaningful aspect of Diana's life except for her removal from Venezuela. On a daily basis, Petitioner picked up Diana from a school that he paid for her to attend. Furthermore, he signed the lease of the apartment where he, Diana and Respondent lived for the ten months prior to Diana's removal. Certainly, Petitioner possessed the ability to decide Diana's domicile during this time, thus establishing his parental authority and custodial rights under Venezuelan law.

### B. Custodial Rights at Time of Removal

When Respondent unilaterally removed Diana from Venezuela, Petitioner was exercising his custodial rights. Respondent relied almost exclusively upon Article 360 of the Organic Law[4] in arguing that Petitioner possessed no custody rights at the time of Diana's removal.[5] Essentially, Respondent maintains that because Diana had not yet turned seven at the time of her removal, Respondent possessed exclusive custodial rights.

■ Respondent's reliance on Article 360 is misplaced. On May 3, 2001, Respondent agrees that she, Petitioner and Diana all lived in the same apartment, and had done so for ten months. Respondent never maintained that she and Petitioner

3. The Court took judicial notice of sections of the Organic Law for the Protection of Juveniles and Adolescents, as well as sections of the Venezuelan Constitution. Furthermore, the Court heard expert testimony on custodial issues from Professor Leonardo D'Onofrio of the University of Carabobo, a former Venezuelan federal judge.

4. Respondent actually relied upon Article 264 of a repealed version of the Organic Law. Article 264 contains different language than Article 360, but encompasses similar legal concepts. (Doc. 14, Exhibit D.)

5. Article 360 of the Organic Law states:
 In the cases of suit for final decree of divorce, physical separation, annulment of the marriage, or if the father and mother were to hold separate residences, they shall decide, by mutual agreement, which of them shall exercise guardianship over the children over seven years of age. The children that are seven years of age or less shall reside with the mother, except in the case in which she is not the legal holder of parental authority or in which, due to reasons of health or safety, it is most appropriate for them to be separated from her temporarily or for an indefinite period of time. In the absence of agreement between the father and the mother over which of the two exercises guardianship over their offspring, the competent judge shall determine to which of the two it shall belong....
 Organic Law, § 2, Art. 360.

held separate residences when she took Diana to Florida. In fact, when Respondent applied to the Florida Circuit Court for a domestic violence injunction against Petitioner, she signed a petition under penalty of perjury stating that she, Petitioner and Diana lived in one home, "as if a family."[6] Therefore, Article 360 of the Organic Law does not apply to this case.[7]

Finally, Respondent claims that because no formal custody agreement was in place when she removed Diana, Petitioner exercised no custodial rights. This argument embodies a continued misunderstanding of Article 360 and ignores Article 3 of the Hague Convention, which clearly states that custody rights need not be established by formal agreement, but can arise by operation of law. *Hague Convention,* Art. 3. If Respondent's view were upheld, any parent who was not a party to an official custodial agreement could abscond with their child, leaving the remaining parent without legal recourse. The Hague Convention acknowledges that a parent seldom prepares legal documents in anticipation of such a shocking action, and safeguards their custodial rights in the country where their child habitually resided. *See Id.,* Proclamation, Art. 1.

## IV. CONCLUSION

The circumstances of this case represent a textbook example of why the United States signed the Hague Convention and enacted ICARA. The proper forum for the clarification of Petitioner and Respondent's custody rights over Diana is in Venezuela. Petitioner has met his burden under ICARA by establishing that: 1) Diana habitually resided in Venezuela prior to

her removal on May 3, 2001; 2) by removing Diana, Respondent breached Petitioner's custodial rights under Venezuelan law; and 3) Petitioner possessed custodial rights at the time of Diana's removal. Therefore, Diana must be returned to Venezuela.

While recognizing the obvious personal dispute between Petitioner and Respondent, the Court has also clearly observed the deep love and concern both parties have for their daughter. The parties must comply with this Order in a manner that best reflects these sentiments and makes Diana's emotional and physical well-being a paramount concern. Therefore,

It is **ORDERED** and **ADJUDGED** that:

1. Petitioner's Petition for Return of Child is **GRANTED**.

2. The parties and Diana shall appear before the Court at 3:30 p.m. on January 23, 2002, to discuss arrangements for returning Diana to Venezuela, in a manner that is in the best interests of the child. The Respondent is responsible for bringing Diana to Court.

3. If the parties cannot reach agreement on a plan for returning Diana to Venezuela, the Court will enter a subsequent Order commensurate with this ruling.

4. All prior Orders issued by the Court regarding travel limitations and visitation remain in force and effect.

---

6. During the *Evidentiary Hearing,* Respondent acknowledged her signature, and that she signed the document under oath and penalty of perjury. Respondent claims, however, that a court official filled out the form.

7. Nonetheless, the Court rejects Respondent's interpretation of Article 360. This statute does not stand for the proposition that Venezuelan mothers may unilaterally extinguish Venezuelan fathers' custody rights without consequence until their children's seventh birthday.