In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 08-2161

JOSE GREGORIO ALTAMIRANDA VALE,

*Petitioner-Appellee*,

*v.*

MARIA JOSE FIGUERA AVILA,

*Respondent-Appellant*.

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 06 CV 1246—**Joe Billy McDade**, *Judge*.

———————

ARGUED JULY 16, 2008—DECIDED JULY 17, 2008[Œ]

———————

Before POSNER, FLAUM, and KANNE, *Circuit Judges*.

POSNER, *Circuit Judge*. The petitioner, Vale, seeking
the return of his children to Venezuela, filed suit in fed-
eral district court against their mother—Avila, his ex-
wife—under the International Child Abduction
Remedies Act, 42 U.S.C. §§ 11601 *et seq*. The Act, imple-
menting the Hague Convention on the Civil Aspects of
International Child Abduction, T.I.A.S. No. 11,670, 1343
U.N.T.S. 89 (Oct. 25, 1980) (which both the United States
and Venezuela have signed), entitles a person whose

———————

[Œ] With notation that opinion would follow.

child has been wrongfully removed to the United States (usually by a parent) in violation of the Hague Convention to sue the wrongdoer in federal court for the return of the child. 42 U.S.C. § 11603(b). The suit is begun by the filing of a petition rather than a complaint. 42 U.S.C. § 11603(b). Wrongful removal is defined as removal "in breach of rights of custody" vested in the party complaining of the removal. Hague Convention, Art. 3(a). These rights include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Id*., Art. 5(a). The Convention also recognizes "rights of access," but they are limited to "the right to take a child for a limited period of time to a place other than the child's habitual residence," *id*., Art 5(b), and the violation of them is not deemed wrongful removal. Vale prevailed in the district court, which ordered the return of the children to Venezuela. We stayed the district court's order pending our decision of Avila's appeal.

The Convention seeks to discourage abductions by parents who either having lost, or expecting to lose, a custody battle remove children to a country whose courts are more likely to side with that parent. *Kijowska v. Haines*, 463 F.3d 583, 586 (7th Cir. 2006); *Blondin v. Dubois*, 189 F.3d 240, 246 (2d Cir. 1999). To prevent such forum shopping, the Convention requires that the determination of whether the child's removal was wrongful be made under the laws of the country in which the child has his or her "habitual residence." Hague Convention, Art. 3. The determination of "habitual residence" is to be based on the everyday meaning of these words rather than on the legal meaning that a particular jurisdiction attaches to them. Otherwise forum shopping would come in by the back

door—the removing parent would remove the child to a jurisdiction that would define "habitual residence" favorably to the parent. *Kijowska v. Haines*, *supra*, 463 F.3d at 586. Should the courts of a nation that is not the child's habitual residence award custody to the parent who is not entitled to it under the law of the child's habitual residence, the custody decree is not a defense to an order to return the child. Hague Convention, Art. 17.

The parties, Venezuelan citizens, were married in Venezuela in 1999 and the following year Avila gave birth to twins. But later she met an American man on the Internet and in 2005 asked Vale for a divorce. The parties divorced that year by mutual agreement. The divorce decree gave Avila physical custody of the children but gave both parents the right (and duty) of *patria potestas*. That is Latin for "paternal power," and in Roman law denoted the father's absolute right (including the right of life and death) over his wife, children, and other subordinate family members. Much modified, it survives as a legal doctrine in civil law countries, such as Venezuela, where it is defined (so far as bears on this case) as "all the duties and rights of the parents in relationship to their children who have not reached majority, regarding the care, development and education of their children." Ley Orgánica para la Protección del Niño y del Adolescente [Organic Law for the Protection of Children and Adolescents], tit. IV, ch. 2, § 1, art. 347. The duties and rights "include the physical custody, representation and administration of the property of the minor child(ren) subject to such authority." *Id.*, art. 348. (The translation into English is by a translator hired by Vale, but Avila does not question its accuracy; nor shall we. We have not found an official translation.) The divorce decree also gave Vale

unlimited visitation rights, custody of the children for two weekends a month, and the right of *ne exeat*, another civil law doctrine, whereby his consent was required before the children could leave the country. *Id.*, § 5, art. 392.

The following year, Avila asked Vale for his consent to her taking the children with her to attend a wedding in Florida. She told him they'd be gone from Venezuela for only five days. She lied. She was moving to the United States with the children in order to marry the man she had met through the Internet. Vale agreed to let her take the kids to Florida for the wedding. She took them to Peoria, Illinois, and married her Internet pal.

Vale filed a petition for the children's return under the Hague Convention. The district judge conducted an evidentiary hearing at which Vale testified and on cross-examination denied, in response to a question by Avila's lawyer, that he had struck his son with a video-game cord. After Vale rested his case, Avila's lawyer suggested to the judge that the parties try to work out a settlement. Avila and her new husband met with Vale and proposed that the children be allowed to stay in the United States but spend every summer, every spring vacation, and every other Christmas vacation with their father in Venezuela, and that because Vale (who has a serious disability) has a low income, while Avila's new husband has (he said) an income of between $100,000 and $150,000 a year, Avila with his help would pay the children's travel expenses.

The parties signed an agreement containing these terms. A provision captioned "resumption of Hague proceedings" states that if Avila fails to comply with the terms of the agreement, Vale "can refile a Hague Petition in either State or Federal court in the United States to seek the re-

turn of the children." Avila argues that the next sentence of the provision, which states that until a certain date she could not raise a statute of limitations defense in a resumed federal suit and that for purposes of such a suit the children's habitual residence would be deemed Venezuela (for that is what it was before Avila removed them to the United States), somehow barred resumption of the suit; we cannot begin to understand the argument.

The settlement agreement provided that the children's habitual residence was now Illinois and that Vale would dismiss his suit, which he did. Avila submitted a copy of the agreement to an Illinois court, which issued an uncontested judgment declaring in accordance with the agreement that the children were now habitual residents of Illinois. But Avila did not comply with the duties that the settlement agreement placed on her, and so this year Vale returned to the federal district court in which he had filed his Hague Convention petition and moved the judge to set aside the judgment dismissing his suit, on the ground that the judgment had been procured by fraud, and to reinstate the suit. Fed. R. Civ. P. 60(b)(3). The judge conducted an evidentiary hearing at the conclusion of which he set aside the judgment, finding on ample evidence that Avila had lied when she had told Vale in the settlement negotiations that she would finance the children's travel to Venezuela and later when she told him that the children could not travel outside the United States because they were not yet lawful residents; they were.

The judge proceeded to the merits of Vale's petition for the return of the children under the Hague Convention, conducted an evidentiary hearing, and concluded that the removal of the children to the United States had indeed

violated the father's "rights of custody." So he ordered the children sent to Vale in Venezuela, precipitating this appeal by Avila.

Avila's main argument is that the district court lacked jurisdiction to reopen the Hague Convention proceeding because of the recital in the state court judgment that the children are habitual residents of Illinois. Illinois law does not have the doctrines of *patria potestas* or *ne exeat*, so (we may assume) if the recital is conclusive of Vale's rights, he loses because the rights of custody on which his claim is based are founded on those doctrines and so his claim fails unless the children's habitual residence is Venezuela. Avila argues that a federal court cannot wrest jurisdiction from a state court, that the state court judgment is entitled to full faith and credit, that the reopening of the federal suit was barred by the *Rooker-Feldman* doctrine (the doctrine that only the U.S. Supreme Court can review a state court judgment), and that, at the very least, the district court should have abstained in favor of the state court proceeding.

None of these arguments holds water. Rule 60(b) has the force of a federal statute, and federal statutes override conflicting state law. A federal court can set aside a judgment by it that was procured by fraud, and the effect is to reinstate the proceeding that the judgment had concluded. *Ditto v. McCurdy*, 510 F.3d 1070, 1077 (9th Cir. 2007); 12 James Wm. Moore, *Moore's Federal Practice* ¶ 60.20 (3d ed. 1997). What then happens in the resumed proceeding may be affected by a parallel state court proceeding or judgment, but that depends on the circumstances. In this case, there was no litigation in the state court, no contest, no significant judicial involvement at all. All that happened was that the parties petitioned the

state court to register "a foreign custody judgment" and the court responded by ordering the clerk of the court to "register and enroll" the Venezuelan divorce decree and the settlement agreement. The state court was not asked to and did not make a determination that the settlement was proper, although the judgment does contain a recital that the agreement to register and enroll the foreign judgment was not "unconscionable." No evidence of fraud had come to light when the settlement agreement was registered in the state court. Nor in the reopened federal proceeding was Vale asking the district judge to enjoin the state court proceeding or judgment. He was asking that the children be returned to Venezuela pursuant to a treaty (the Hague Convention) that, like its implementing statute, overrides a state custody decree. Article 17 of the Convention is explicit about this override, and anyway a treaty implemented by a federal statute overrides a state law or judgment. U.S. Const., art. VI, cl. 2; *Medellin v. Texas*, 128 S. Ct. 1346, 1365 (2008); *Missouri v. Holland*, 252 U.S. 416, 432, 435 (1920) (Holmes, J.).

The settlement agreement itself authorizes Vale to resume his Hague Convention suit if Avila violated it, and she did—and the agreement is part of the state court judgment. So all other considerations to one side, that judgment could not be violated by the reopening of the suit, or by the judgment rendered by the district court after the reopening, since implicit in the state court judgment authorizing the reopening was the possibility that the result would be an order under the Hague Convention that the children be sent back to Venezuela.

So the district court had jurisdiction over Vale's petition and the question on the merits is whether Avila's removal of the children to Illinois violated Vale's "rights of cus-

tody" under Venezuelan law and was therefore in violation of the Hague Convention, since before she removed them to the United States, Venezuela was unquestionably their habitual residence. The Convention does not speak simply of "custody," but of "rights of custody," and these are broadly defined to include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." To *include*: so the enumeration is not necessarily exhaustive. By virtue of the doctrine of *patria potestas*, Vale, the father, had rights relating to the care of the person of the child, and, by virtue both of that doctrine and even more clearly by virtue of the doctrine of *ne exeat*, the right to determine that the child's place of residence would remain Venezuela rather than the United States.

No more is necessary to establish that Vale had "rights of custody," which Avila infringed. *Furnes v. Reeves*, 362 F.3d 702, 714-16 (11th Cir. 2004); *Whallon v. Lynn*, 230 F.3d 450, 458-59 (1st Cir. 2000); *In re B. del C.S.B.*, 525 F. Supp. 2d 1182, 1196 (C.D. Cal. 2007); *Garcia v. Angarita*, 440 F. Supp. 2d 1364, 1378-79 (S.D. Fla. 2006); *Gil v. Rodriguez*, 184 F. Supp. 2d 1221, 1225 (M.D. Fla. 2002). Several cases, it is true—*Villegas Duran v. Arribada Beaumont*, Nos. 02-55079, 02-55120, 2008 WL 2780656, at *4 (2d Cir. July 18, 2008); *Fawcett v. McRoberts*, 326 F.3d 491, 499-500 (4th Cir. 2003), and *Croll v. Croll*, 229 F.3d 133, 138-41 (2d Cir. 2000)—hold that the doctrine of *ne exeat* does not create a right of custody, reasoning that if it did the effect would be to send the child to a parent who did not have custodial rights but merely a right to prevent the child from being removed to another jurisdiction. That is a fair point, though cutting against it is the invitation to abduction that is tendered if a parent can violate *ne exeat* with impunity.

But we need not decide whether the doctrine of *ne exeat* creates custody rights, for in none of the cases that answer the question in the negative did the plaintiff also have the right of *patria potestas*. Only *Gonzalez v. Gutierrez*, 311 F.3d 942 (9th Cir. 2002), is cited for the proposition that *patria potestas* does not confer a custody right, and all that that case actually holds (besides that the doctrine of *ne exeat* does not by itself create a right of custody) is that *patria potestas* is a default doctrine and hence does not override rights conferred by a valid custody agreement between the parents. *Id*. at 954. (The father in *Gonzales* had access rights as well as *ne exeat*, but not *patria potestas*.) There is no such override here. The divorce decree gave Avila physical custody of the children subject to Vale's right of *patria potestas*. It provided: "The Father and the Mother shall both EXERCISE THE PATRIA POTESTAS over our children as we have been doing and as established by the Law. The aforementioned children shall remain under the Guard of the mother, with whom they are currently living." When the parent who does not receive physical custody is given the rights and duties of *patria potestas*, he has custody rights within the meaning of the Hague Convention.

So the cases we cited earlier hold, none to the contrary, and we think they are right. The rights and duties of *patria potestas* are so extensive that a parent given them is thereby denoted a fit custodial parent (as may not be the case when the parent is merely given the right of *ne exeat*), even if, when both parents are holders, one is likely to have physical custody, as otherwise the children will be shuttled back and forth between two homes ("joint custody"), which can be, on balance, a bad thing, depending on the circumstances. Robert E. Emery, *Marriage,*

*Divorce, and Children's Adjustment* 79-81 (2d ed. 1999);
Judith S. Wallerstein, Julia M. Lewis & Sandra Blakeslee,
*The Unexpected Legacy of Divorce: A 25 Year Landmark Study*
215-16 (2000); Jann Blackstone-Ford, *The Custody Solutions
Sourcebook* 102 (1999).

So Vale has a prima facie right to have the children
returned to Venezuela. Article 13(b) of the Hague Conven-
tion excuses return, however, if the abductor proves by
clear and convincing evidence (42 U.S.C. § 11603(e)(2)(A))
that "there is a grave risk that [the child's] return would
expose the child to physical or psychological harm or
otherwise place the child in an intolerable situation." The
evidence presented in the district court on this question,
mainly the contested assertion that Vale once struck his
son with a video-game cord, fell short of meeting this
demanding burden. See *Gaudin v. Remis*, 415 F.3d 1028,
1036-37 (9th Cir. 2005); *Whallon v. Lynn*, *supra*, 230 F.3d at
459-60; compare *Van De Sande v. Van De Sande*, 431 F.3d 567
(7th Cir. 2005); *Baran v. Beaty*, 526 F.3d 1340, 1345-46 (11th
Cir. 2008); *Simcox v. Simcox*, 511 F.3d 594, 604-08 (6th Cir.
2007); *In re Application of Adan*, 437 F.3d 381, 395-97 (3d Cir.
2006); *Walsh v. Walsh*, 221 F.3d 204, 219-20 (1st Cir. 2000).
Or so at least the district judge could find without being
thought to have committed a clear error.

AFFIRMED.