In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2983

RAUL SALAZAR GARCIA,

*Petitioner-Appellee,*

*v.*

EMELY GALVAN PINELO,

*Respondent-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 C 09644 — **Edmund E. Chang**, *Judge.*

ARGUED DECEMBER 3, 2015 — DECIDED DECEMBER 22, 2015

Before WOOD, *Chief Judge*, and MANION and HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. Raul Salazar Garcia and Emely Galvan Pinelo, both Mexican citizens, dated only briefly in 2001 and early 2002. But their relationship had one lasting consequence: in October 2002, Galvan gave birth to a child, D.S., in Monterrey, Nuevo León, Mexico. Although Galvan at all times has had physical custody of D.S., Salazar played an active part in the child's life. In 2013, Galvan and D.S. moved to

Chicago. Salazar now seeks D.S.'s return to Mexico under the
Hague Convention on Civil Aspects of International Child
Abduction, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 (Oct. 25,
1980), to which both Mexico and the United States are parties.
In the United States, it has been implemented through the In-
ternational Child Abduction Remedies Act (ICARA), 22
U.S.C. § 9001 *et seq.* The Convention "entitles a person whose
child has wrongfully been removed to the United States in vi-
olation of the Convention to petition for return of the child to
the child's country of 'habitual residence,' unless certain ex-
ceptions apply." *Norinder v. Fuentes*, 657 F.3d 526, 529 (7th Cir.
2011). Once the child is in that country, the local courts are
empowered to resolve any questions about custody, support,
or other family law matters.

This case presents us with three questions. First, we must
determine whether, for the purpose of determining "rights of
custody" under the Convention, a petitioner's proof of for-
eign law should be treated as a question of law or a question
of fact. Second, we must decide whether Salazar has shown
that he had sufficient rights over D.S. at the time of the reten-
tion to trigger the Convention's protections. Finally, we must
evaluate whether the district court went beyond the bounds
of its discretion when it declined to allow D.S. to stay in the
United States pursuant to the Convention's mature-child ex-
ception.

We conclude that the Hague Convention is no exception
to the general rule, reflected in Federal Rule of Civil Proce-
dure 44.1, that an issue about foreign law is a question of law,
not fact, for purposes of litigation in federal court. We agree
with the district court that Salazar had the necessary custodial
right (referred to in Mexico either by its Latin name, *patria*

*potestas*, or occasionally by its Spanish name, *patria potestad*) over D.S. at the time when Galvan refused to permit his return to Mexico. Because D.S.'s habitual residence is Mexico (a point that is now uncontested), Galvan's retention of D.S. is wrongful under the Convention. Finally, although we consider it a close question, we conclude that the district court had adequate reason to refuse to defer to D.S.'s indications that he prefers to stay in the United States. We therefore affirm the district court's judgment.

**I**

As we noted, Salazar and Galvan's brief relationship left them with a son, D.S., who was born in October 2002. They never married, and they never lived together. In 2006, a Nuevo León court entered a custody order recognizing Galvan and Salazar as D.S.'s parents. The court awarded physical custody of D.S. to Galvan and gave Salazar weekly visitation rights. For the first ten years of his life, D.S. lived with his mother in Monterrey, and Salazar visited regularly in accordance with the custody agreement.

In late 2012, Galvan requested Salazar's assistance in obtaining a passport and visa for D.S. to visit the United States. She intended to visit relatives in Texas and then to take D.S. to either Disney World or Disneyland. Before that trip took place, however, she became engaged to an American citizen named Rogelio Hernandez, whom she married in July 2013. Around this time, she decided that she wanted to move with D.S. to the United States. While Galvan had told Salazar about her initial plans to travel with D.S. to the United States as a tourist, she did not advise him of her change in plans. Salazar became suspicious, however, when he saw news of Galvan's

engagement on Facebook. That led to a meeting among Galvan, Salazar, and D.S. on July 30, 2013, at a Starbucks in Monterrey. Galvan and Salazar agreed then that D.S. would move to Chicago with his mother and stay there for one school year. What was not clear was what was to happen at the end of that year. Salazar recalls that the parties agreed that D.S.'s wishes would be dispositive, and Galvan thought that the two parents simply agreed to conduct further discussions.

As planned, Galvan and D.S. moved to Chicago on August 15, 2013, and D.S. enrolled in school. Throughout the year, D.S. and Salazar kept in touch through Skype and Facebook. D.S. visited his father in Mexico for the Christmas holiday in December 2013. In his conversations with Salazar, D.S. said that he wanted to return to Mexico at the end of the school year; at the same time, he was telling his mother that he wanted to stay in Chicago.

Believing that the parties had agreed that D.S.'s wishes would govern his placement after the 2013-14 school year, and further believing that D.S. wanted to return to Mexico, Salazar showed up in Chicago in July 2014 with two return tickets to Mexico, one for him and one for D.S. This time it was Galvan who was taken by surprise: she believed that Salazar was in Chicago only to visit. Salazar and D.S. spent several days as tourists in Chicago. On July 21, 2014, in another Starbucks, D.S. and Salazar announced to Galvan that D.S. was moving back to Mexico with Salazar. Galvan did not believe that he wanted to return, nor did she think that she had an obligation to defer to his wishes. Salazar left the Starbucks with D.S., but the Chicago Police later contacted Salazar and instructed him to return D.S. to Galvan. Salazar complied. He returned alone to Monterrey, where he filed the petition that

is now before us. The Mexican Central Authority transferred the petition to the United States Department of State, which filed it in the district court on December 2, 2014.

The district court appointed a guardian *ad litem* for D.S. At first, D.S. did not indicate a preference for either Mexico or Chicago. Over time, however, his views evolved. In late April 2015, D.S. told his guardian that he wanted to stay in Chicago. The district court conducted an in-camera hearing with D.S.— by then 13 years old—to ascertain his views. D.S. told the judge that he preferred to stay in Chicago because it had better schools and opportunities, was safer, and he did not want his mother to be forced to pay Salazar's costs and fees. He indicated that he wanted to finish eighth grade in Chicago, but that if he were not admitted to a good high school after eighth grade, he might return to Mexico. While he stated a preference for remaining in Chicago, he did not object to returning to Mexico.

At some point while all this was happening, Galvan's immigration status took a turn for the worse. We go into more detail below, but for present purposes it is enough to say that both she and D.S. had overstayed their tourist visas and had no other basis for staying in the United States. This meant, her immigration lawyer told her, that she probably could not travel outside the United States, even to visit D.S. This news prompted Galvan to request a second in-camera hearing between the judge and D.S. She believed her immigration difficulties would change D.S.'s mind: since she would be unable to visit him in Mexico, it would be very difficult for D.S. to see his mother, possibly for a very long time. The district court obliged. During the second hearing, D.S. more clearly objected to returning to Mexico. While he gave several reasons

for doing so, he also indicated that he would not object to returning if Galvan's immigration situation were quickly resolved and she could travel freely between the United States and Mexico.

On August 21, 2015, the district court held an evidentiary hearing at which it received testimony from Salazar, Galvan, and Hernandez on the issues of the scope of Salazar and Galvan's July 2013 agreement and whether the United States or Mexico was D.S.'s country of habitual residence. In orders entered on August 16 and August 28, 2015, the court granted summary judgment for Salazar. It found as a matter of fact that when Salazar and Galvan met in the Monterrey Starbucks in July 2013, they agreed that it would be D.S.'s decision whether to remain in Chicago after one school year had passed. It also found that Mexico was D.S.'s country of habitual residence. Applying the law of the Mexican state of Nuevo León, the court found that Salazar had the right of *patria potestas* over D.S., and that this qualifies as a "right of custody" for purposes of the Convention. (We refer occasionally to "Mexican law" in this opinion; we intend that phrase to encompass both Mexican federal law, such as the Convention, and the state law of Nuevo León.) This meant, the court held, that as of the summer of 2014 D.S. was wrongfully retained. That meant that he had to be returned to Mexico, unless the mature-child exception recognized by the Convention was met (*i.e.* D.S. was mature enough to make his own decision, and his decision was to stay in the United States). The court found that D.S. had eventually objected to returning to Mexico, and that he was sufficiently mature. It nonetheless declined to give effect to D.S.'s wishes, because it determined that doing so would not serve the purposes of the Convention. It thus ordered D.S. to be returned to Mexico.

Galvan has appealed. She offers three reasons for rejecting the district court's decision. First, she argues that Salazar did not prove his custody rights by a preponderance of the evidence, and thus that there is no basis for finding that D.S. was wrongfully retained. Second, she asserts that as a matter of Mexican law, Salazar does not have the necessary custody rights for Convention purposes. Finally, she argues that the district court abused its discretion by declining to apply the Convention's mature-child exception. She does not contest the district court's findings with regard to D.S.'s country of habitual residence or the scope of the July 2013 agreement.

## II

We review the district court's findings of fact for clear error, and its conclusions of law—whether American, foreign, or international—*de novo*. See *Koch v. Koch*, 450 F.3d 703, 710 (7th Cir. 2006) (collecting cases); *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996) (citing Fed. R. Civ. P. 44.1 ("In determining foreign law … [t]he court's determination must be treated as a ruling on a question of law.")).

At bottom, the Hague Convention "is an anti-abduction treaty." *Redmond v. Redmond*, 724 F.3d 729, 739 (7th Cir. 2013). It has two purposes: "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention art. 1, T.I.A.S. No. 11670. It is meant "to deter parents from absconding with their children and crossing international borders in the hopes of obtaining a favorable custody determination in a friendlier jurisdiction." *Walker v. Walker*, 701 F.3d 1110, 1116 (7th Cir. 2012).

In order to accomplish its objectives, the Convention "employs a 'remedy of return.'" *Ortiz v. Martinez*, 789 F.3d 722, 728 (7th Cir. 2015) (quoting *Kahn v. Fatima*, 680 F.3d 781, 783 (7th Cir. 2011)). This remedy "entitles a person whose child has wrongfully been [retained in] the United States in violation of the Convention to petition for return of the child to the child's country of 'habitual residence.'" *Norinder*, 657 F.3d at 529. A removal or retention is wrongful under the Convention where "it is in breach of rights of custody attributed to a person … under the law of the State in which the child was habitually resident immediately before the removal or retention," and those rights were "actually exercised … or would have been so exercised but for the removal or retention" at the time of the removal or retention. Hague Convention art. 3, T.I.A.S. No. 11670.

Several principles of the Convention have a bearing on this case. First, it is not our prerogative "to settle a custody dispute." *Ortiz*, 789 F.3d at 728; Hague Convention art. 19, T.I.A.S. No. 11670 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."); 22 U.S.C. § 9001(b)(4). Rather, the Convention is designed to restore the pre-removal status quo. See *Ortiz*, 789 F.3d at 728. More broadly, it "seeks ... to prevent a later decision on the matter [from] being influenced by a change of circumstances brought about through unilateral action by one of the parties." Elisa Pérez–Vera, *Explanatory Report: Hague Conference on Private International Law* ¶ 71, in 3 *Acts and Documents of the Fourteenth Session* 426, 447–48 (1980). Finally, it is a "basic principle" of the Convention "that a child's country of habitual residence

is 'best placed to decide upon questions of custody and access.'" *Whallon v. Lynn*, 230 F.3d 450, 456 (1st Cir. 2000) (quoting *Explanatory Report* ¶ 34, at 434–35).

## A

We turn first to the question whether Salazar must "prove" the content of the relevant Mexican law by a preponderance of the evidence, as if it were a question of fact, or if this is a straightforward question of law for the court. Galvan takes the former position and asserts that Salazar failed to prove that the rights he possesses under Mexican law qualify for protection under the Convention. Thus, she concludes, the district court should have dismissed his petition.

Whatever one might think of Galvan's position in the abstract, it does not stand up to scrutiny under the governing rules of procedure. Federal Rule of Civil Procedure 44.1 states that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." It specifies that "[t]he court's determination must be treated as a ruling on a question of law." *Id.* And this is not a rule exclusively for the district courts. To the contrary, "[i]n determining these questions of [foreign] law, both trial and appellate courts are urged to research and analyze foreign law independently." *Twohy v. First Nat'l Bank of Chicago*, 758 F.2d 1185, 1193 (7th Cir. 1985). This is because "one of the policies inherent in Rule 44.1 is that whenever possible issues of foreign law should be resolved on their merits and on the basis of a full evaluation of the available materials." *Id.* (quoting 9 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2444 (1971)).

Galvan argues that two cases—*In re Griffin Trading Co.*, 683 F.3d 819, 824 (7th Cir. 2012), and *Banque Libanaise Pour Le Commerce v. Khreich*, 915 F.2d 1000, 1006 (5th Cir. 1990)—support her position, but they do not. *Griffin* and *Khreich* address the distinct issue of choice of law, which is not contested in our case. The parties can waive a choice-of-law argument, but the court has an independent responsibility to ascertain the content of any given law. See *Twohy*, 758 F.2d at 1193; *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). Indeed, the court is not limited to materials submitted by the parties when it undertakes this job: it is free to conduct its own research.

A central issue in the present case is whether Salazar had sufficient custody rights over D.S. to be entitled to relief under the Convention and ICARA. The answer depends on Mexican law, and thus the inquiry lies comfortably within Rule 44.1's ambit. In this respect, the U.S. federal rules of procedure are entirely consistent with the Convention, which is based on respect for the law of the country of the child's habitual residence. *Whallon*, 230 F.3d at 456, which in turn refers to *Explanatory Report* ¶ 34, at 434–35 (also noting at ¶ 67 that "the law of the child's habitual residence is invoked in the widest possible sense.").

Galvan attempts to avoid this logic by arguing that the bundle of fact and law on which the district court made its decision had to be treated as a question of fact. But she has no quarrel with the facts that Salazar presented; instead, she says that Salazar did not produce enough evidence of the law of Nuevo León to permit the district court to resolve the issue. The district court was not, however, limited to the evidence Salazar presented (and for what it is worth, he did present some). The district court was required to find that it was more

likely than not, given its independent analysis of the relevant Mexican law and its consideration of Salazar's factual evidence, that the rights Salazar possessed are protected by the Convention. The important question, to which we now turn, is whether the court came to the right conclusion.

B

A removal or retention is wrongful if (1) "in breach of rights of custody … under the law of the state in which the child was habitually resident immediately before the removal or retention"; and (2) "at the time of removal or retention those rights were exercised … or would have been so exercised but for the removal or retention." Hague Convention art. 3, T.I.A.S. No. 11670. Because D.S.'s habitual residence at the time of the retention was the Mexican state of Nuevo León, the governing law is that state's Civil Code.

Salazar relies on a doctrine known as *patria potestas* to support his claim. *Patria potestas* is a concept derived from the Roman civil law tradition; literally, the Latin words mean "the power of the father." Historically, the power of the father over his children was absolute, both in scope and to the exclusion of others. Patricia Begné, *Parental Authority and Child Custody in Mexico*, 39 Fam. L.Q. 527, 529 (2005). Under Roman and German law, *patria potestas* permitted a father to discipline his children in any way, up to and including by death; that power endured throughout the father's life. *Id.* Mexico's codes of 1870 and 1884 conveyed *patria potestas* first to the father of a child and only secondarily to the mother. *Id.* It was only in 1928 that the Civil Code began the process of eliminating its gender bias. *Id.*

Today, *patria potestas* is based on the central values of "fairness and reciprocity"; it is a gender-neutral legal regime that regulates the relationship between parents (or parent-like figures) and their children. *Id.* at 530 (citing Código Civil para el Distrito Federal art. 411); see also Civil Code for Nuevo León (CCNL) art. 411 ("Respect and mutual consideration shall govern the relationship between parents and children."). This court has recognized *patria potestas* as a "right[] of custody" within the meaning of the Convention. See *Altamiranda Vale v. Avila*, 538 F.3d 581, 587 (7th Cir. 2008) ("When the parent who does not receive physical custody is given the rights and duties of *patria potestas*, he has custody rights within the meaning of the Hague Convention."). While we interpreted Venezuelan law in *Avila*, the concept of *patria potestas* is substantially the same under the law of Nuevo León.

Galvan does not dispute that *patria potestas* constitutes a "right of custody" under the Convention. *Cf. Abbott v. Abbott*, 560 U.S. 1 (2010) (noncustodial parent's *ne exeat* right is a "right of custody" for purposes of the Convention). Rather, she denies that Salazar has such a right. She does so on two bases: primarily, she asserts that he never possessed the *patria potestas* right over D.S.; her back-up position is that any *patria potestas* right he may have held was extinguished by the 2006 custody agreement.

1

Galvan's more ambitious argument—that Salazar never possessed *patria potestas* over D.S.—was never squarely presented to the district court. In her reply brief, Galvan argues that she nevertheless did not waive it because it was an essential part of her argument that "the parties' rights were limited to what was specified in the [2006] court order." This assertion

is not borne out by Galvan's summary judgment submission, which at no point asserts that Salazar lacked *patria potestas* before the custody agreement. This probably constitutes waiver of the point. Even if it were merely forfeited, however, we think that Salazar has the better of the argument.

Galvan relies on article 416 of the Civil Code for Nuevo León, because it is the only provision that expressly applies to parents who never lived together. Article 416 states:

> When both parents have recognized a child born out of wedlock and they live together, they will jointly exert parental authority/responsibility (*patria potestas*). If they do not live together, what is established by articles 380 and 381 will apply to grant custody of the child.

Articles 380 and 381 describe the procedures for establishing custody depending on the timing of the parents' recognition of the child. Neither mentions *patria potestas*.

Galvan argues that article 416's mention of the *patria potestas* right with regard to parents who live together—and especially the article's silence on this point with regard to parents who do not—indicates that *patria potestas* does not attach automatically when the parents never cohabitated. She finds support for this position in article 417, which provides that "[w]hen the parents of a child born out of wedlock that were living together[] separate, both retain parental authority/responsibility (*patria potestas*)." This article, too, has nothing to say about unmarried parents who never lived together.

Salazar counters that *patria potestas* is a default doctrine that attaches automatically to both birth parents upon their acknowledgment of parentage. He provided the district court with a certificate from the Mexican Central Authority stating

that "[a]ccording to Mexican Law, individuals acquire parental rights (*patria potestad*) over a child since the moment of birth, or registration before the civil registry as a result of an acknowledgment of paternity." Salazar also notes that article 414 states that "[p]arental authority/responsibility (*patria potestas*) is exerted jointly by both parents." Other authorities support this view. The Begné article suggests that *patria potestas* is "mandatory" and "not transferable." Begné, *Parental Authority*, 39 Fam. L.Q. at 530 ("Parental authority has relevant social significance, as it involves the fulfillment of the most important responsibility that a person can assume … . It is therefore considered by law to be mandatory."). "Parents exercising their authority 'always keep … the right to shelter their descendants.'" *A.A.M. v. J.L.R.C.*, 840 F. Supp. 2d 624, 634–35 (E.D.N.Y. 2012) (quoting JOSÉ ANTONIO MÁRQUEZ GONZÁLEZ, FAMILY LAW IN MEXICO 81 (2011)). "The [Mexican] Supreme Court has ruled that … '*patria potesta[d]*, as a general rule, must be exercised by two parents jointly, and only as an exception may it be exercised by one parent.'" *Saldivar v. Rodela*, 879 F. Supp. 2d 610, 624 (W.D. Tex. 2012) (quoting STEPHEN ZAMORA *ET AL.*, MEXICAN LAW 459–60 (2004)). Salazar argues that article 416's second sentence is better read as addressing the rules for physical custody in the case of unmarried, noncohabiting parents, not as a statement on broader rights of parental authority. After all, if the parents are cohabiting, it makes sense to assume that they will exercise joint custody.

Galvan's textual argument depends entirely on the maxim *expressio unius est exclusio alterius* (to include one thing is to exclude another). But even assuming that this notion exists in Mexican law and operates there just as it does in the United

States, it is at best "an aid to determine the intent of the statute." 82 C.J.S. *Statutes* § 424 (2015)*.* Even if we set aside the certificate from the Mexican Central Authority (and we see no reason to do so), nothing justifies our applying the maxim here. *Patria potestas* is central to Mexican family law. See *Lieberman v. Tabachnik*, 625 F. Supp. 2d 1109, 1118 (D. Colo. 2008) (citing Mexican attorney's testimony that "*patria potestas* is the most sacred concept in Mexican family law"). Galvan maintains that article 416 overrides the default rule in the case of unmarried, noncohabiting parents. But we reject the idea that the Code would exclude a subset of parents from such a fundamental right in this backhanded manner.

Galvan's interpretation of article 416 has the further disadvantage of creating a gap in the law: no one would have *patria potestas* over a child born to unmarried noncohabiting parents. Even Galvan accepts that article 416 does not award *patria potestas* to unmarried, noncohabiting parents; nor do articles 380 and 381. The latter articles describe only how to award physical custody, not *patria potestas*, for unmarried, noncohabiting parents. Here and elsewhere the Code carefully distinguishes between *patria potestas* and custody. See CCNL art. 415 *bis* ("Even if they do not have custody of the minors, those exerting parental responsibility (*patria potestas*), have a right to coexist (spend time) with their descendants … ."). Galvan's view, taken to its logical extreme, would produce the odd result that even she would not possess *patria potestas* over D.S. today—indeed, no one would. This would be inconsistent with article 412, which dictates that "nonemancipated minors are under parental authority/responsibility (*patria potestas*) as long as the ancestors that must exert it according to the Law subsist." Galvan's response is to shift her attention to the 2006 custody agreement as the source of

her own *patria potestas*. We turn to that agreement in a moment. For now, we conclude that under the law of Nuevo León, *patria potestas* attaches automatically at birth or acknowledgment. Since at least 2006, Salazar has been D.S.'s acknowledged father; he thus has the *patria potestas* right over D.S. unless something in the 2006 agreement requires a different result.

2

Putting original rights to one side, Galvan urges that the 2006 agreement not only clarified (or conferred) her sole physical custody rights, but also granted *patria potestas* to her exclusively. In doing so, she says, it necessarily terminated any original *patria potestas* right Salazar had; it did so by failing to mention them.

Some courts have held that *patria potestas* may be extinguished by a custody agreement. See, *e.g.*, *Gonzalez v. Gutierrez*, 311 F.3d 942, 954 (9th Cir. 2002) ("Here, unlike the situation in *Whallon*, the parties have executed a formal, legal custody agreement, thus eliminating any basis for relying on *patria potestas*."), *abrogated by Abbott,* 560 U.S. at 10, 22; see also *Avila*, 538 F.3d at 587. None of these decisions, however, cites any Mexican law for this proposition, nor do we find any basis for it in the Civil Code for Nuevo León. Even if they are correct, however, the question would remain whether the 2006 agreement before us had that effect.

Chapter III of the CCNL spells out the conditions under which *patria potestas* may be suspended or terminated. The list is extensive, detailed, and specific. The conditions all relate to the parent's ability or willingness to care for the child. See CCNL arts. 443–448. *Patria potestas* terminates automatically

only by the death of the person exercising it, the child's emancipation by marriage, or the child's reaching majority. See CCNL art. 443. The right *can* be terminated if the person exercising it (1) is convicted of two or more serious crimes endangering the child or the child's assets, (2) is convicted of an intentional offense against the child or the child's assets, (3) mistreats or abandons the child in a way that puts the child at risk, (4) fails to visit the child in a public welfare institution, (5) abandons the child for greater than 180 days, or (6) leaves the child alone for more than 30 days without any information about the child's origin. *Id.* art. 444. It can also be terminated if the person exercising it "is expressly condemned to its loss." *Id*. It can be suspended for lack of capacity, formally declared absence, or a criminal sentence imposing suspension. *Id.* art. 447. Article 447 *bis* notes that the *patria potestas* right may be limited judicially, but the sole justification listed is "to protect the physical or psychological integrity" of the child. *Id.* art. 447 *bis*.

Neither a custody agreement nor anything akin to one is listed as a condition that may terminate, suspend, or even limit *patria potestas*. Nor is there a general provision for the judicial surrender of parental authority and responsibility. To the contrary, article 448 states expressly that "[p]arental authority/responsibility [*patria potestas*] is not waivable." Article 448 enumerates only two circumstances under which a person with *patria potestas* may be excused of his or her duties: (1) if the person is "sixty years or older" or (2) if he or she is "unable to properly carry out [his or her] duties" because of "a state of regular poor health." *Id*. The fact that article 415 distinguishes between custody and parental authority rights further buttresses the idea that *patria potestas* cannot be lost through a custody agreement. Even if it were theoretically possible for a

parent to lose *patria potestas* through a custody agreement, *this* custody agreement would not suffice. Article 444's sole subsection not conditioning termination on a specific contingency indicates that a person may lose the *patria potestas* right by being "expressly condemned to its loss." The 2006 custody agreement did not mention either Galvan or Salazar's *patria potestas* right, let alone "expressly condemn" Salazar to its loss. The custody agreement thus did not extinguish Salazar's *patria potestas* right over D.S.

C

As we noted earlier, *patria potestas* is considered a custodial right for purposes of the Convention. Since Salazar has that right, and Galvan arranged to have D.S. kept in the United States against Salazar's will, it follows that for Convention purposes D.S. was wrongfully retained. This conclusion, however, does not end our inquiry. Under the Convention, the district court had the discretion to refuse to return D.S. to Mexico if Galvan proved by a preponderance of the evidence that D.S. "object[ed] to being returned and ha[d] attained an age and degree of maturity at which it is appropriate to take account of [his] views." *Hague Convention* art. 13, T.I.A.S. No. 11670 (mature-child exception); 22 U.S.C. § 9003(e)(2)(B) (burden of proof for article 13 defenses). The district court found that D.S. was sufficiently mature to invoke the exception, and we see nothing in the record to cast doubt on that assessment. The district court also found that D.S. eventually stated his objection to being returned to Mexico during the second in-camera hearing. Both formal prerequisites for this exception are therefore satisfied.

The question remains, however, whether the exception automatically applies in such a case, or if the district court retains discretion to follow the rule rather than the exception. In our view, it would be inconsistent both with the Convention and with the often sensitive questions involved in domestic relations to take a mechanical approach. This is consistent with the way other courts and the U.S. Department of State have understood the exceptions. They have said that a district court retains discretion not to apply an exception, and that its decision either way is reviewed only for abuse of discretion. See *de Silva v. Pitts*, 481 F.3d 1279, 1285 (10th Cir. 2007) ("[A] court still has discretion to order the return of the child if it would further the aim of the Convention which is to provide for the return of a wrongfully removed child.") (citing *Friedrich*, 78 F.3d at 1067); *England*, 234 F.3d at 270–71; see also *Hague Convention* art. 13, T.I.A.S. No. 11670 ("The judicial or administrative authority *may* also refuse to order the return of the child" if the mature-child exception applies) (emphasis added); U.S. Dep't of State Public Notice 957: Hague Int'l Child Abduction Convention, 51 Fed. Reg. 10494, 10509 (1986) ("The courts retain the discretion to order the child returned even if they consider that one or more of the exceptions applies.").

Here, the district court decided that it would be inconsistent with the aims of the Convention to refuse to repatriate D.S. First, it noted D.S.'s ambivalence before he finally objected to returning to Mexico, and the fact that D.S.'s objection was founded "almost entirely" on his belief that his mother would not be able to travel to and from Mexico because of her immigration status. Galvan observes, correctly, that D.S. gave other reasons, too, but the district court's sense of which rea-

son predominated was not clear error. The court was particularly struck by the fact that D.S. stated that he would not object to return if his mother's travel to and from Mexico were not impeded, based on the assumption that she could obtain the proper visa within six months.[1] The court never asked D.S. how he would react to periods longer than six months.

While this omission troubles us, in the end it does not compel a finding that the district court abused its discretion. The court's greatest concern was independent of the amount of time D.S. might go without seeing his mother. It believed that the application of the mature-child exception in this case would reward Galvan for problems of her own making. Her immigration status was unstable because she (and D.S.) overstayed their tourist visas. It reasoned that allowing D.S. to stay in the United States would allow Galvan to benefit from her own violations of the Convention and U.S. immigration laws.

---

[1] The record is unclear both on the status of Galvan's application for legal permanent resident status and on the accuracy of the six-month estimate. Apparently Galvan had been trying ever since her arrival in the United States to pursue a visa, but she represents that she could not afford the necessary fees. The process takes some time: a qualified person (such as her husband) must first submit a Petition for Alien Relative (an I-130) on her behalf. The alien must also submit an application for adjustment of status (I-485). Although U.S. Citizenship and Immigration Services indicates that the entire process can take as little as seven months, see USCIS Processing Time Information, https://egov.uscis.gov/cris/process-TimesDisplayInit.do (last updated Dec. 15, 2015) (choose "Chicago IL" from "Field Office" drop-down menu), the Department of State represents that "[t]he length of time [for processing] varies from case to case and cannot be predicted for individual cases with any accuracy." Bureau of Consular Affairs, U.S. Dep't of State, *Immigrant Visa for a Spouse of a U.S. Citizen (IR1 or CR1)*, http://travel.state.gov/content/visas/en/immigrate/family/immediate-relative.html#13 (last visited Dec. 16, 2015).

Galvan argues that applying the mature-child exception would not "reward" her for her immigration problems because her visa overstay was not a "strategic ploy" and the visas expired before the wrongful retention. She notes that even the district court recognized that her conduct was not in bad faith. The court's rationale, she urges, fits only more egregious cases of child abduction.

Article 13 is meant to address both systemic concerns—in particular, deterrence—and individual cases. See *England*, 234 F.3d at 271 ("The Convention's primary aims are to 'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.'") (quoting *Friedrich*, 78 F.3d at 1063); *Explanatory Report* ¶¶ 16 (noting that one of the Convention's two central objectives is "deterring" the abductor by "depriv[ing] his actions of any practical or juridical consequences"), 17 (noting the enforcement of the objective of "effective respect for rights of custody and of access … belongs on the preventive level"), at 429–30. The district court was concerned that exercising the exception in this case would set a precedent that allows a parent to prevent the return of a child by problems of his or her own making. It reasoned that an inquiry into a litigant's subjective intentions is a difficult endeavor, and one potentially subject to abuse by savvy litigants. It would be difficult for a court to smoke out bad faith in these situations. Neither the Convention nor ICARA forbids the district court to take these concerns into account when it makes its ultimate decision. The Convention's "defenses … are narrowly construed" at least in part to preserve that deterrence. *De Silva*, 481 F.3d at 1285.

The district court also reasoned that this was a weak case for the mature-child exception because D.S.'s objection was

partially premised on getting "used" to missing his father and extended family in Mexico, and D.S.'s views had not been consistent. At the time of the wrongful retention in July 2014, D.S. wanted to return to Mexico. By the time of the first in-camera hearing, he preferred to stay in Chicago, but did not object to being returned to Mexico. It was only at the second in-camera hearing—roughly 13 months after he was wrongfully retained—that D.S. unequivocally objected to being returned. The district court reasoned that refusing to return D.S. under such conditions would reward Galvan for the continued wrongful retention. It would also signal that a parent might escape the Convention by running out the clock until the wrongfully retained child became accustomed to her new home. See, *e.g.*, *Yang v. Tsui*, 499 F.3d 259, 280 (3rd Cir. 2007) (affirming district court's decision not to exercise exception because where the child "grew attached to her family and life" in the place where she was wrongfully retained during the retention itself, applying the exception "would encourage parents to wrongfully retain a child for as long as possible[,] … and reward [the retaining parent] for violating [the petitioner's] custody rights, and defeat the purposes of the Convention"). The Convention is intended "to secure the *prompt* return of children wrongfully removed to or retained in any Contracting State." Hague Convention art. 1, T.I.A.S. No. 11670 (emphasis added). Creating an incentive for delay would frustrate this central purpose.

## III

There is no doubt that this is a close case. Two points, however, are clear: Salazar had *patria potestas* over D.S. at the time of the retention; and he had "rights of custody" recognized by

the Convention. That is enough to establish Galvan's retention of D.S. in violation of her agreement with Salazar as wrongful under the Convention. Whether to apply the mature-child exception was a question within the district court's discretion. We see nothing powerful enough in this record to warrant the rejection of its conclusion, and so we AFFIRM its judgment in favor of Salazar.